JOHN L. JACKSON AND YVONNE JACKSON, ET AL.,[1] Petitioners *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 15789-82,      Filed March 27, 1986.
32889-83,
32890-83.

---

[1]The cases of the following petitioners have been consolidated: John L. Jackson and Yvonne Jackson, docket Nos. 15789-82 and 32889-83; and Gregory M. Barrow and Timsey Barrow, docket No. 32890-83.

*R. LaMar Bishop*, for the petitioners.
*Richard W. Kennedy*, for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in, and additions to, petitioners' Federal income tax as follows:

| Petitioners | Taxable year | Deficiency | Additions to tax | |
|---|---|---|---|---|
| | | | Sec. 6651(a)[2] | Sec. 6653(a) |
| John L. and | 1978 | $18,879.05 | - - - | - - - |
| Yvonne Jackson | 1979 | 38,910.28 | - - - | $1,945.51 |
| | 1980 | 74,804.85 | - - - | 3,740.24 |
| Gregory M. and | 1978 | 50,906.70 | $7,096.00 | 2,545.34 |
| Timsey Barrow | 1979 | 29,889.90 | 7,422.48 | 1,494.50 |
| | 1980 | 57,518.00 | 14,379.50 | 2,875.90 |
| | 1981 | 3,350.00 | 837.50 | 167.50 |

The Commissioner also asserted in his answer to this action that petitioners John L. and Yvonne Jackson failed to report income on their return for 1978 in the amount of $85,000 as John L. Jackson's distributive share of partnership income. The unreported partnership income increases the deficiency determined by the Commissioner for the taxable year 1978 from $18,879.05 to $61,379.03.

The issues for decision concern whether deductions for license amortization and advertising expense claimed by petitioners and a partnership in which petitioners were the only partners were properly disallowed. More specifically, we must determine (1) whether Barrow, Jackson, and J & G were engaged in the trade or business of distributing Norwood products during 1978; (2) whether actual payment is prerequisite to a deduction under section 1253(d)(2); (3) whether the notes given under the sublicense agreements by

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All rule references are to this Court's Rules of Practice and Procedure.

Barrow, Jackson, and J & G are bona fide under *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); (4) whether the notes given under the sublicense agreements and the advertising cooperative notes are excessively contingent; (5) whether the at-risk rules of section 465 limit the losses deducted by the Barrows and the Jacksons with respect to the sublicenses; (6) the amount at risk of Barrow and Jackson at the end of the taxable years 1979, 1980, and 1981; (7) whether the statute of limitation bars assessment against petitioners Jackson for the distributive share of partnership income for the taxable year 1978; and (8) whether petitioners are subject to the additions to tax determined by the Commissioner.

### FINDINGS OF FACT

Some of the facts in this case have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated by this reference.

All of the petitioners resided in Salt Lake City, Utah, at the time they filed their petitions in this case. Petitioners John L. and Yvonne Jackson, husband and wife, timely filed joint Federal income tax returns for the taxable years 1978, 1979, and 1980.[3] Petitioners Gregory M. and Timsey Barrow, husband and wife, filed joint Federal income tax returns for the taxable years 1978, 1979, 1980, and 1981.[4]

The issues before us are derived from the enterprise undertaken by petitioners Jackson and Barrow to manufacture and distribute a specially designed cassette tape player/recorder. Jackson and Barrow (also collectively referred to as petitioners) became aware of the special characteristics of the tape player/recorder, and the potential business opportunity it presented, at about the time that they met the inventor of the device, Elwood G. Norris (Norris), during the summer of 1978.

---

[3] Yvonne Jackson is a party to this action solely because she filed joint Federal income tax returns with her husband. For this reason all references to Jackson shall mean petitioner John L. Jackson.

[4] Timsey Barrow is a party to this action solely because she filed joint Federal income tax returns with her husband. For this reason all references to Barrow shall mean petitioner Gregory M. Barrow.

Norris represented that the device, known as the Norris XLP, was capable of playing 24 hours of material on a specially recorded cassette tape that would only afford 3 hours of playing time on a normal player/recorder. The extra long playing capability of the Norris XLP was achieved by playing back cassette tapes at one-quarter of the normal speed. Because reducing the speed to one-quarter of normal would only quadruple the length of playing time, the additional two-fold increase was to be achieved by special circuitry that allowed the player-/recorder to play back tapes recorded in the quarter track format, instead of the normal one-half track. Norris also represented that the Norris XLP was capable of recording at quarter speed and in the quarter track format. Norris applied for a U.S. patent on certain portions of his invention in 1978. The application for patent was eventually granted.

Jackson and Barrow were intrigued with the market potential that they perceived for the Norris XLP and so began negotiating to acquire the rights to the device. The negotiations led to an informal letter agreement dated October 13, 1978, in which Norris agreed to grant Barrow and Jackson an exclusive license to manufacture, distribute, and sell the Norris XLP.[5] The agreement between Jackson, Barrow, and Norris was finally formalized in a document denominated "License Agreement," which was dated December 13, 1978.

Prior to the execution of the "License Agreement," Jackson and Barrow took several steps preparatory to the inception of their new business. During negotiations with Norris, petitioners contracted for a marketing study of the sales potential for the Norris XLP. The marketing study, which was issued to petitioners on October 18, 1978, projected first year sales of the Norris XLP of between 700,000 and 1 million units.

On or about November 1, 1978, petitioners formed Norwood Industries, Inc. (Norwood). Norwood, a Utah corporation, was initially capitalized by the issuance of 1,000 shares of common stock for $1 per share. At the time of the formation of Norwood, petitioners Barrow and

---

[5]Norris retained certain rights to distribute his invention through the LDS church.

Jackson were its sole stockholders.[6] Barrow, Jackson, and a secretary were the only employees of Norwood.

Norwood was formed to be the licensee of the Norris XLP. Barrow and Jackson decided that the best way to finance this venture would be for Norwood to further sublicense the rights to the Norris products. At about this time, Norwood divided the United States into 600 territories and began selling sublicenses to distribute Norwood products within the territories.

At about the time Norwood was formed, petitioners also formed a partnership called J & G Distributing (J & G). J & G was formed for the purpose of acquiring and selling Norwood sublicenses, as well as distributing Norwood products under its own Norwood territorial sublicenses. Jackson and Barrow were equal general partners of J & G. In November 1978, Barrow and Jackson quit their previous occupation as insurance salesmen to devote more time to the new venture. From this point in time, their efforts were primarily divided between serving as officers and employees of Norwood, as partners of J & G, and as individual sublicensees.

The licensing agreement negotiated by Barrow, Jackson, and Norris was executed on December 13, 1978, between Norwood, as licensee, and Norris. In return for its exclusive license to manufacture, distribute, and sell the Norris XLP, Norwood was required to pay Norris $1,300,000, plus a royalty of $5 per unit sold. Payments on the $1,300,000 obligation were to be made as follows:

(1) $125,000 on or before Dec. 29, 1978
(2) $250,000 on or before Feb. 28, 1979
(3) $250,000 on or before Feb. 28, 1980
(4) $250,000 on or before Feb. 28, 1981
(5) $250,000 on or before Feb. 28, 1982
(6) $175,000 on or before Feb. 28, 1983

The term of the license continued until the time of the expiration of the last patent relating to the Norris XLP or December 31, 2010, whichever occurred later.

---

[6]In 1980, the capital of Norwood was increased in the amount of $200,000 by issuing shares of common stock to Barrow and Jackson at a price of $4 per share. At a later time, another person became a stockholder by investing $66,250.

During 1978, Norris had a small number of the cassette player/recorders available. Norris, doing business as Rocky Mountain Products Co., engaged Atlas Electronics Corp. Ltd. (Atlas) of Hong Kong to manufacture the Norris XLP. Norwood sold one Norris XLP obtained from Norris in early December 1978. This sale was not attributable to any sublicensee territory, but was made by Norwood on its own behalf. No other sales were made by Norwood or its sublicensees during 1978.

In early December 1978, Barrow and Norris traveled to Hong Kong to meet with officials of Atlas and to inspect its facilities. While in Hong Kong, Barrow and Norris observed the manufacture of Norris XLP machines. This particular production run was being made pursuant to an agreement between Rocky Mountain Products Co. and Atlas. During this trip, Barrow obtained assurances that Atlas would be willing to produce at least 700,000 cassette recorders per year for Norwood. At that time, Norwood placed an initial order for 125,000 recorders with delivery to commence with a shipment of 6,300 recorders in March 1979.

On December 30, 1978, Norris received a shipment of recorders from Atlas. Norris delivered these machines to Norwood during the first two days of 1979.

During the period of the 6th through the 9th of January 1979, representatives of Norwood and several of its sublicensees attended a consumer electronics show in Las Vegas, Nevada. During the 12th through the 15th of January 1979, Jackson attended an audio visual show in New Orleans, Louisiana. The purpose of attending these shows was to introduce the new cassette tape player-/recorder to members of the industry, to line up distributors, and to sell cassette recorders. During one of these shows, Barrow and Jackson engaged a distributor for two of their individual sublicense territories. During these shows, Norwood sold a few recorders for its own account. At about this time, Norwood discovered that the recorders received in the first days of January 1979 did not work properly.

Barrow immediately returned to Hong Kong to work with Atlas to resolve the problem with the recorders. Upon investigation, Atlas' engineers discovered that the problem was not a manufacturing or quality control error, but was the fault of Norris' original design. At Barrow's request, Atlas' engineers immediately began redesigning the circuitry used in the Norris XLP. Atlas' engineers claimed that the design problems could be rectified in time to meet the scheduled March 1979 delivery.

While redesigning the circuitry of the Norris XLP, Atlas' engineers discovered additional flaws in the original design by Norris. Norwood authorized Atlas to correct the newly discovered flaws before shipping any recorders to Norwood in the U.S. This decision caused the first shipment of the redesigned recorders, then known as the Norwood XLP, to be delayed until August 1979. The redesigned recorder was sufficiently different from the original Norris design that Atlas obtained U.S. patents for its work. Those new patents were immediately assigned to Norwood.

Because of the design problems with the Norris XLP, Norwood did not make the February 28, 1979, payment to Norris as required in the License Agreement. In May 1979 Norris filed a breach of contract action against Norwood in state court in Salt Lake City, Utah. Although a preliminary settlement was reached in this action in June 1979, Norris filed a second cause of action against Norwood in U.S. District Court for the District of Utah, Central Division, in January 1980. The Federal cause of action alleged breach of contract, anti-trust violations, and patent and trademark violations. Settlement in the Federal and State causes of action was not reached until March 1982. The settlement of these cases provided that Norwood would have a worldwide, nonexclusive, royalty-free license to manufacture, use, and sell products covered by certain patents held by Norris. As part of the settlement agreement, Norwood made an undisclosed payment to Norris. Other than the initial license payment of $125,000, Norwood made no other payments required by the December 13, 1978, license agreement.

From inception through 1981, Norwood, either through its sublicensees or on its own account, has sold approximately 11,000 player/recorder units plus various accessories.

## The Sublicense Agreements

### 1978

Norwood's efforts to sell territorial sublicenses, through which most Norwood products would be distributed, resulted in the sale of approximately 145 sublicenses in 1978.

The sublicenses sold in 1978 were for an initial term of 7 years. The sublicenses could be renewed for an additional 5 years upon the payment of a set sum and on a year-to-year basis thereafter. The sublicenses granted the sublicensee the exclusive right to purchase recorders and related products from Norwood and to distribute them within the sublicense territory.

The purchase price for the sublicenses sold in 1978 was $160,000 per territory. Projections from the marketing study requested by petitioners were used to prepare pro forma financial statements for a single territory for the 7-year term of the sublicenses. The capitalization of earnings approach was used to calculate a value of $160,000.

The purchase price of the 1978 sublicenses was ordinarily paid as follows:

| | |
|---|---|
| $9,500 | Cash |
| 5,000 | Recourse promissory note due Apr. 1, 1979 |
| 145,500 | Nonrecourse note due no later than Dec. 1, 1985 |
| 160,000 | Total purchase price |

Both the recourse note in the amount of $5,000 and the nonrecourse note in the amount of $145,500 bore stated interest of 7½ percent per year. The first installment of principal and interest on the $145,500 nonrecourse note was due 30 days after the close of the month during which the sublicensee received the proceeds of the first sale of Norwood products within the territory. The sublicense agreement was cancelable by either party for "just cause." In the event the agreement was terminated, the unpaid notes would be deemed canceled. The sublicense agreement also provided that the sublicensee purchase a minimum number of recorders from Norwood. The minimum purchase requirement, however, was eliminated if Norwood could not deliver the recorders. There is no record of any purchase of recorders by the sublicensees during 1978.

Each sublicensee, as a condition of the licensing agreement, was required to enter into a cooperative advertising agreement with Norwood requiring that the sublicensee pay the sum of $20,000 per territory for the purpose of developing an advertising program. The advertising cooperative funds were payable by the sublicensees to Norwood. Norwood was to place the funds in a segregated bank account and exercise full control over how they were spent.

The $20,000 per territory that the sublicensees were required to pay into the advertising cooperative was payable $500 in cash at the time the sublicense was acquired plus a nonrecourse promissory note in the amount of $19,500. The nonrecourse note for the advertising cooperative, like the license agreement nonrecourse note in the amount of $145,500, bore interest at the rate of 7½ percent per year. The first installment of principal and interest was due 30 days following the end of the month when the first sale was made under the sublicense. Any unpaid balance on the note was payable by July 1, 1985.

On November 17, 1978, Norwood engaged a firm to prepare and execute an advertising campaign for the Norwood XLP. A multimedia advertising campaign was subsequently developed including television commercials and advertisements in national publications such as Time and T.V. Guide.

Petitioners Jackson and Barrow each acquired two territorial sublicenses in 1978. Jackson acquired a sublicense territory in Hawaii and another covering the Salt Lake City area of Utah. Barrow also acquired two sublicense territories, one in Hawaii and another covering the State of Utah, but excluding the Salt Lake City area. J & G also acquired sublicenses in 1978, some of which it, in turn, sold.

The terms under which Jackson and Barrow acquired their Norwood sublicenses in 1978 varied slightly from the normal pattern set forth above. The price paid for each territory remained $160,000, and they were also obligated to participate in the advertising cooperative. Jackson and Barrow each paid $8,000 in cash for their two sublicenses, $1,000 of which was attributable to the advertising cooperative. They each also executed a nonrecourse promissory note in the amount of $309,000 and a recourse note in the

amount of $4,000 in satisfaction of their sublicense agreement obligations. Jackson and Barrow also executed promissory notes with a principal balance of $39,000 to satisfy their advertising cooperative obligations.

Similarly, the terms under which J & G acquired Norwood sublicenses in 1978 differed from the normal terms. J & G made one cash payment of $16,000. J & G also executed a nonrecourse note with a principal balance of $618,000 to satisfy its sublicense agreement obligations. Lastly, J & G executed a nonrecourse note with a principal balance of $88,000 to satisfy its obligations under the advertising cooperative.

### 1979

Norwood sold 47 territorial sublicenses during 1979. The sublicenses sold in 1979 were for a period of 20 years ending December 31, 1999, and were nonrenewable. The price for each 1979 sublicense was $500,000 payable at a rate of $25,000 each year. The first $25,000 annual payment was payable as follows:

| | |
|---|---|
| $10,000 | Cash |
| 5,000 | Recourse note due no later than Mar. 1, 1980 |
| 10,000 | Recourse note due no later than Dec. 1, 1999 |
| 25,000 | Total annual payment |

The $5,000 note bore interest at a rate of 12½ percent year. The $10,000 recourse note bore interest at a rate of 7½ percent per year and required the payment of periodic installments of principal and interest. Any unpaid balance on this second note was payable no later than December 31, 1999. A sublicensee could choose to satisfy subsequent annual obligations under the 1979 sublicenses by executing a $25,000 note payable to Norwood, which was due on December 31, 1999, and bore interest at a rate of 7½ percent per year.

Purchasers of sublicense territories in 1979 were also required to participate in an advertising cooperative. The 1979 advertising cooperative required the payment of $35,000 payable as follows:

| | |
|---|---|
| $500 | Cash |
| 500 | Nonrecourse note due Mar. 1, 1980 |
| 14,500 | Recourse note due Dec. 31, 1999 |
| 19,500 | Nonrecourse note due Dec. 15, 1980 |
| 35,000 | |

The $500 note bore interest at a rate of 12½ percent per year. The $14,500 recourse note, which bore interest at a rate of 7½ percent per year, was payable in installments equivalent to $1 per Norwood recorder/player sold to the sublicensee by Norwood. The $19,500 nonrecourse note due December 15, 1980, bore interest at a rate of 7½ percent per year. In the event the sublicensee sold more than 100 Norwood recorder/players, the $19,500 nonrecourse note was to be satisfied by a cash payment or by the execution of a recourse promissory note due December 31, 1999, or a combination of both. Sublicensees were also required to pay an additional advertising fee of $1 per Norwood recorder/player purchased from Norwood.

Neither Jackson nor Barrow purchased any sublicenses for their own accounts during 1979. J & G did purchase five additional sublicenses during 1979. The payments made by J & G for the five sublicenses acquired in 1979 varied from the standard payment terms. The standard terms for the purchase of five sublicenses under the licensing agreement would have required the payment of $50,000 in cash and the delivery of recourse notes totaling $25,000 due on March 1, 1980, and recourse notes totaling $50,000 due on December 31, 1999. J & G executed a recourse note with a principal amount totaling $50,000 due no later than December 31, 1999, but did not pay any cash. Instead, J & G also executed a $75,000 recourse note due March 1, 1980. The $50,000 note executed by J & G in satisfaction of its obligations under the 1979 licensing agreements required monthly installments calculated at the rate of $12.99 per unit sold by the sublicensee.

Similarly, J & G did not make payments as required under the standard advertising cooperative agreement. The differences between standard payment terms for five sublicenses and payments by J & G are shown by the following:

| Standard payment terms | Payments by J & G |
|---|---|
| $2,500 Cash | $2,500 Recourse note due Dec. 1, 1980 |
| 2,500 Nonrecourse note due Mar. 1, 1980 | 2,500 Nonrecourse note due Mar. 1, 1980 |
| 72,500 Recourse note due Dec. 31, 1999 | 38,297 Recourse note[7] due Dec. 31, 1999 |

[7]The record does not contain a complete copy of this note so it is unclear whether this note was executed with recourse.

<table>
<tr><td><em>Standard payment terms</em></td><td><em>Payments by J & G</em></td></tr>
</table>

|  |  |
|---|---|
| *Standard payment terms* | *Payments by J & G* |
| $97,000 Nonrecourse note<br>    due Dec. 15, 1980 | $131,703 Nonrecourse note[8]<br>    due Dec. 15, 1980 |
| <u>175,000</u> | <u>175,000</u> |

<u>$35,000</u> Advertising fee per territory
    (5 territories)

The notes with principal balances of $38,297 and $131,703 executed by J & G to satisfy its advertising cooperative obligation each required payment in quarterly installments calculated at the rate of $1 per unit sold during the preceding calendar quarters. Any unpaid balance was payable on the due dates stated in the notes.

### 1980

Territorial sublicenses sold during 1980 were for a nonrenewable term of 25 years ending December 31, 2004. The purchase price for each 1980 sublicense was $250,000 plus, for the first time, a royalty fee. Norwood required an initial payment of $25,000. Subsequently, a sublicensee was required to pay amounts as follows:

| | | |
|---|---|---:|
| $1,000 per year for 5 years beginning in 1985 | — | $5,000 |
| 4,000 per year for 5 years beginning in 1990 | — | 20,000 |
| 15,000 per year for 5 years beginning in 1995 | — | 75,000 |
| 25,000 per year for 5 years beginning in 2000 | — | 125,000 |
| | | 225,000 |
| Initial payment | | +25,000 |
| Total purchase price for 1980 sublicenses | | 250,000 |

The initial payment of $25,000 could be paid either all in cash or $15,000 in cash and a $10,000 promissory note bearing interest at a rate of 7½ percent per year due no later than December 31, 1995. This $10,000 note required monthly installments of principal and interest in an amount

[8]The record does not contain a complete copy of this note, so it is unclear whether this note was executed with recourse. An addendum to the 1979 Co-op Advertising Agreement signed by Barrow on behalf of J & G indicates that this note is to be nonrecourse. Further, the note is entitled "Advertising and Promotion Promissory Note Non-Recourse." Provided that J & G had minimum sales of 100 units, this note could be satisfied by the execution of a recourse note in the same amount due December 31, 1999.

equal to the greater of $80.56 or an amount calculated as 10 percent of the total suggested retail price of all player/recorders sold by the sublicensee during the month. Sublicensees could elect to satisfy payment obligations in subsequent years by executing and delivering promissory notes bearing interest of 7½ percent per year due not later than December 31, 2004, a date coinciding with the termination of the 25-year sublicense term.

The royalty obligation of a sublicensee varied over the term of the license. The royalty obligation was 1 percent of the total gross receipts of the sublicensee every year through 1984. For the period January 1, 1985, through December 31, 1989, the royalty increased to 10 percent of total gross receipts from the sale of all Norwood products after the sale of 100 record players each year. From January 1, 1990, through December 31, 1994, the royalty of 10 percent of total gross receipts applied only after the sublicensee sold in excess of 300 player/recorders. For the period January 1, 1995, through December 31, 2004, the royalty obligation was 1.2 percent of the total gross receipts of the sublicensee.

As with the territorial sublicenses sold in 1978 and 1979, the purchaser of a sublicense in 1980 was required to participate in a cooperative advertising arrangement. The sublicensee was required to pay a total of $35,000 per sublicense into the advertising fund, $1,000 in cash and $34,000 by a recourse note bearing interest at a rate of 7 1/2 percent per year. The $34,000 note was payable in installments calculated as $2 for each player/recorder sold to the sublicensee by Norwood, plus $0.50 for each Norwood prerecorded cassette tape sold to the sublicensee. In any event, the balance on the note was due on or before December 31, 1999.

Twenty-eight territorial sublicenses were sold during 1980. Barrow and Jackson each purchased one additional sublicense acting in their individual capacities.

Again the terms of the purchase by Barrow and Jackson from Norwood in 1980 varied from the standardized provisions set forth above. Instead, each paid $2,000 in cash and

executed a recourse promissory note with a principal balance of $48,000. They also each paid $1,000 in cash and executed recourse notes with principal balances of $69,000 in satisfaction of their obligations under the 1980 advertising cooperative agreement. These notes were identical to those described under the model agreements for 1980 other than the principal amounts. Barrow and Jackson each made additional cash payments during 1980 of $4,591, of which $591 was designated as payment of accrued interest. Barrow and Jackson each made cash payments with respect to their individual Norwood sublicenses during 1980 totaling $7,591.

Barrow and Jackson did not cause J & G to purchase any additional Norwood sublicenses during 1980. However, J & G did have income from the previously acquired sublicenses. J & G did not execute any additional notes payable to Norwood during the taxable year 1980 although two payments of principal and interest were made. Those loan payments totaled $55,200 and consisted of principal repayment of $48,563 and interest of $6,637.

### Subsequent Offer To Purchase Sublicenses

In 1983 Coffin & Associates, a California limited partnership, became interested in acquiring the Norwood territorial sublicenses. To this end, Coffin & Associates offered to purchase each outstanding Norwood sublicense from the current sublicensee for a total consideration of $158,500. The only consideration flowing to the current sublicensees, however, was the assumption of debt to Norwood in the principal amount of $145,500.[9] All of the obligations assumed by Coffin & Associates were to be converted to nonrecourse debts if they were not already so. Of the remaining consideration, $8,500 was to be paid to Norwood and $4,500 was to satisfy an unspecified obligation of the selling sublicensee to a third party.

---

[9] The amount of debt Coffin & Associates was willing to assume was equivalent to the nonrecourse debt owed to Norwood by the purchasers of Norwood sublicenses in 1978, even though the parties recognized that the sublicense terms varied from year to year. Coffin & Associates was also willing to make adjustments for any note payments made by the Norwood sublicensees.

*Tax Treatment of Sublicenses by Petitioners and J & G*

Jackson made one cash payment of $8,000 in regard to the individual territorial sublicenses purchased in 1978. Jackson had no sales of Norwood products attributable to his territories in 1978. On their Federal income tax return for the taxable year 1978, petitioners Jackson claimed advertising expense in the amount of $40,000 and amortization expense of $40,000. They did not claim any expense of an operational nature.

On their Federal income tax return for the taxable year 1979, the Jacksons reported gross income in the amount of $10,009 from the sale of 294 player/recorders. They did not claim any amortization expense and only a small amount of advertising expense for the taxable year 1979. Jackson made no cash payments on his sublicense obligations during 1979.

Jackson acquired an additional sublicense during 1980. He made cash payments on his sublicense obligations totaling $7,591. The Jacksons reported gross income from the sublicense activities totaling $12,915.22 for the taxable year 1980. On their tax return for the taxable year 1980, the Jacksons claimed amortization expense of $54,000 and advertising expense of $71,674, which, along with other expenses, resulted in a net loss of $123,804.84.

Barrow made one cash payment in the amount of $8,000 respecting his individually held territorial sublicenses during 1978. The Barrows reported zero gross income, and amortization expenses in the amount of $40,000 from the Norwood sublicenses on the Federal income tax return for the taxable year 1978. They also claimed advertising expense in the amount of $40,000 for the taxable year 1978. The Barrows did not claim any expense of an operational nature.

For the taxable year 1979, the Barrows reported gross income of $2,945 in regard to the sublicenses. They claimed amortization expense of $12,000, and other expenses that resulted in a reported net loss from the sublicenses for the taxable year 1979 of $11,334.

Barrow acquired a third territorial sublicense in 1980. Two hundred thirty-eight recorder/players were sold in his territories during the taxable year 1980, yielding gross income of $7,904. Expenses claimed by the Barrows with respect to

the Norwood sublicenses, primarily amortization expense in the amount of $40,000 and advertising expense in the amount of $72,872, produced a net loss of $112,551 for the taxable year 1980. Barrow made cash payments in 1980 in regard to his sublicense obligations totaling $7,591.

Barrow's sublicense territories had gross income totaling $5,470 based on the sale of 229 player/recorders during the taxable year 1981. The Barrows reported expenses regarding the sublicense territories totaling $45,286 including deductions in the amount of $40,000 for amortization expense and $3,997 for "License Fee," resulting in a reported net loss of $39,816 for the taxable year 1981. Barrow made cash payments with respect to his Norwood sublicenses totaling $38,550 during 1981.

J & G filed a partnership return of income for the taxable year 1978. It made one cash payment of $16,000 with respect to its Norwood sublicenses. It reported gross receipts of $170,000 for the taxable year 1978, all of which was earned from the sale of sublicenses received from Norwood. J & G did not sell any recorders during 1978. Nevertheless, it reported amortization expense of $80,000 and advertising expense of $90,000 for the taxable year 1978 attributable to sublicenses retained by the partnership. As a result of the amortization and advertising expense deductions claimed, J & G reported zero net income. For this reason, neither Barrow nor Jackson reported any income on the tax returns for the taxable year 1978 for their distributive shares of partnership income.

J & G partnership reported gross receipts of $189,797 for the taxable year 1979, but because of amortization expense of $149,000 and advertising expense of $40,797, the partnership had zero net income. Of the total gross receipts of $189,797, only $27.03 was from the sale of Norwood products. The balance was from the sale of Norwood sublicenses.

J & G made cash payments with respect to its Norwood sublicenses during 1980 totaling $55,200. For the taxable year 1980, J & G had gross income of $91,009 and net income of $23,823. J & G reported advertising expense of $59,703, but no amortization expense. The Jacksons reported income in the amount of $11,911.50 as their share of

partnership income for the taxable year 1980. The Barrows reported only $1,301 as their share of J & G partnership income on the joint Federal income tax return for the taxable year 1980.

The cash payments, deductions claimed, and net income from the Norwood enterprise of Barrow, Jackson, and J & G are summarized as follows:

| Taxpayer | Year | Cash payments | Amorti-zation deduction | Advertis-ing expense | Net income/ (loss) |
|----------|------|---------------|-------------------------|----------------------|--------------------|
| Jackson  | 1978 | $8,000        | $40,000                 | $40,000              | ($80,000.00)       |
|          | 1979 | 0             | 0                       | 1,323                | 318.59             |
|          | 1980 | 7,591         | 54,000                  | 71,674               | (123,804.84)       |
| Barrow   | 1978 | 8,000         | 40,000                  | 40,000               | (80,000.00)        |
|          | 1979 | 0             | 12,000                  | 298                  | (11,334.00)        |
|          | 1980 | 7,591         | 40,000                  | 72,872               | (112,551.00)       |
|          | 1981 | 38,550        | 40,000                  | 0                    | (39,816.00)        |
| J & G    | 1978 | 16,000        | 80,000                  | 90,000               | 0                  |
|          | 1979 | 0             | 149,000                 | 40,797               | 0                  |
|          | 1980 | 55,200        | 0                       | 59,703               | 23,823.00          |

The Commissioner issued statutory notices of deficiency to the Jacksons for the taxable years 1978, 1979, and 1980. The deficiency in Federal income tax of $18,879.05 determined by the Commissioner for the Jacksons' taxable year 1978 was mainly attributable to disallowed amortization and advertising expense deductions related to Jackson's individual territorial sublicenses. In his answer, filed August 19, 1982, to the Jacksons' petition in this case, the Commissioner alleged additional deficiencies in the Jacksons' income tax for the taxable year 1978. The Commissioner alleged that amortization and advertising deductions claimed by J & G should be disallowed thereby causing Jackson's share of partnership income to increase from zero to $85,000.[10] The additional partnership income increased the Jacksons' 1978 tax deficiency from $18,879.05 to $61,379.03.

The Commissioner determined deficiencies in the Jacksons' Federal income tax for the taxable years 1979 and 1980 in the amounts of $38,910.28 and $74,804.85, respectively. These deficiencies were attributable in large

---

[10]An identical adjustment of 85,000 was made in the Commissioner's statutory notice of deficiency issued to the Barrows for the taxable year 1978.

measure to disallowed amortization and advertising expenses claimed by Jackson and J & G in regard to their sublicenses.[11] The Commissioner also determined additions to tax for negligence under section 6653(a) for 1979 and 1980.

The Barrows and the Jacksons each claimed small amounts as deductions for advertising expense on their Federal income tax returns for the taxable year 1979 with respect to the sublicenses acquired individually in 1978. The Commissioner allowed these deductions without adjustment.

The Commissioner determined deficiencies in the Barrows' Federal income tax for the taxable years 1978, 1979, 1980, and 1981 in the amounts of $50,906.70, $29,889.90, $57,518, and $3,350, respectively. These deficiencies were primarily attributable to disallowed amortization and advertising expense deductions, unreported partnership income, or both, all arising out of Barrow's participation in the Norwood venture.[12] The Commissioner also imposed additions to tax under sections 6651(a) and 6653(a) for the taxable years 1978, 1979, 1980, and 1981.

## OPINION

The issues before us revolve primarily around the advertising and license amortization expense deductions claimed by Barrow and Jackson for the taxable years in issue. We must also decide the proper amount of income Barrow and Jackson each should report as their share of partnership income from J & G during the taxable years before us. Our decision of whether the amortization and advertising expenses claimed by J & G are properly allowable will resolve the proper amount of partnership income reportable by each partner.[13]

---

[11]The statutory notices of deficiency for the taxable years 1979 and 1980 issued by the Commissioner also disallowed charitable deductions claimed by the Jacksons. Jackson contributed a 10-percent interest in a coal lease to a university. The Commissioner determined that this coal lease had no value. The Jacksons stipulated to be bound by our determination of the fair market value of the charitable contribution in *Butler v. Commissioner*, T.C. Memo. 1985-613.

[12]The Barrows also claimed a charitable contribution deduction based on the donation of a 10-percent interest in a coal lease to a university and have stipulated to be bound by our determination of the fair market value of the charitable contribution in *Butler v. Commissioner, supra.*

[13]Respondent, in his answer, asserted that the deficiency in the Jacksons' tax liability for the taxable year 1978 determined by the Commissioner should be increased. The increased

Respondent has raised several alternative arguments to disallow these deductions. We have considered arguments other than those discussed and find them to be without merit.

Section 1253 governs the tax treatment of certain transfers of franchises, trademarks, and trade names where the "transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name." For purposes of section 1253, the term franchise "includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area." Sec. 1253 (b)(1). Section 1253(b)(2) defines a "significant power, right, or continuing interest" by providing a nonexclusive listing of such rights.[14]

The territorial sublicenses granted by Norwood to Jackson, Barrow, and J & G clearly come within the definition of franchise found in section 1253(b)(1). Furthermore, because the sublicense and advertising cooperative agreements give Norwood such a degree of control over the activities of the sublicensees, Norwood has retained sufficient "significant power, right, or continuing interest." In particular we note that each sublicensee must participate in an advertising cooperative over which Norwood has control. Further, because Norwood is the exclusive licensee of the Norwood

deficiency was attributable to the disallowance of deductions claimed by J & G, which, therefore, increased Jackson's share of partnership income. Because this matter was first raised in his answer, respondent must carry the burden of proof with respect to the proper amount of partnership income taxable to the Jacksons for the taxable year 1978. Rule 142(a).

[14](2) SIGNIFICANT POWER, RIGHT, OR CONTINUING INTEREST.—The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred:

(A) A right to disapprove any assignment of such interest, or any part thereof.

(B) A right to terminate at will.

(C) A right to prescribe the standards of quality of products used or sold, or of services furnished, and of the equipment and facilities used to promote such products or services.

(D) A right to require that the transferee sell or advertise only products or services of the transferor.

(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.

(F) A right to payments contingent on the productivity, use, or disposition of the interest transferred, if such payments constitute a substantial element under the transfer agreement.

We also note that proposed regulations concerning the meaning of "significant power, right, or continuing interest" include the following as the type of interest anticipated in sec. 1253:

A right to participate in a continuing manner in the commercial or economic activities with respect to a transferred franchise such as sales promotion (including advertising) * * *. [Sec. 1.11253-2(d)(8), Proposed Regs., 36 Fed. Reg. 13,151 (July 15, 1971).]

XLP recorder/players, the sublicensees must acquire their inventory from Norwood. The tax treatment of the sublicenses granted by Norwood in 1978, 1979, and 1980 will, therefore, be governed by section 1253.

Section 1253(d) governs the treatment of payments made by a transferee of a franchise. If the payments are "contingent on the productivity, use, or disposition of the franchise," then, under section 1253(d)(1), the payments are deductible only if they are otherwise allowed as a deduction under section 162. If the payments made by a transferee are not contingent, section 1253(d)(2) governs the tax treatment of such payments. Section 1253(d)(2) provides the period over which a transferee may deduct fixed payments depending on whether the license obligation is paid off with a single payment, approximately equal installments, or by any other arrangement for payment.[15]

Because the 1978 Norwood sublicenses required a single payment of $160,000 represented by cash and notes, section 1253(d)(2)(A) provides the period over which petitioners may ratably deduct the cost of the sublicense. Because the term of the sublicenses granted is less than 10 years, the cost may be deducted over the term of the sublicense, 7 years. The sublicenses sold in 1979 required equal annual payments of $25,000 for 20 years; therefore, section

---

[15] SEC. 1253(d). TREATMENT OF PAYMENTS BY TRANSFEREE.

(1) CONTINGENT PAYMENTS.—Amounts paid or incurred during the taxable year on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name which are contingent on the productivity, use, or disposition of the franchise, trademark, or trade name transferred shall be allowed as a deduction under section 162(a) (relating to trade or business expenses).

(2) OTHER PAYMENTS.—If a transfer of a franchise, trademark, or trade name is not (by reason of the application of subsection (a)) treated as a sale or exchange of a capital asset, any payment not described in paragraph (1) which is made in discharge of a principal sum agreed upon in the transfer agreement shall be allowed as a deduction—

(A) in the case of a single payment made in discharge of such principal sum, ratably over the taxable years in the period beginning with the taxable year in which the payment is made and ending with the ninth succeeding taxable year or ending with the last taxable year beginning in the period of the transfer agreement, whichever period is shorter;

(B) in the case of a payment which is one of a series of approximately equal payments made in discharge of such principal sum, which are payable over—

(i) the period of the transfer agreement, or

(ii) a period of more than 10 taxable years, whether ending before or after the end of the period of the transfer agreement,

in the taxable year in which the payment is made; and

(C) in the case of any other payment, in the taxable year or years specified in regulations prescribed by the Secretary, consistently with the preceding provisions of this paragraph.

1253(d)(2)(B) provides that petitioners may amortize the cost of the sublicenses as payments are made. The 1980 sublicenses require varying payments over the entire 25-year term and, so, the cost may be ratably deducted as the payments are made under the sublicense agreement.[16]

### Were Petitioners Engaged in an Active Trade or Business in 1978?

Although section 1253(d)(2) clearly governs the deduction of amortization expense attributable to the cost of the sublicenses, it does not make clear whether the transferee of a franchise, trademark, or trade name must also be conducting an active trade or business in order to claim a deduction under section 1253(d)(2). This section, unlike section 1253(d)(1), lacks a specific reference to the trade or business requirement of section 162. Petitioners, therefore, claim that they may deduct the cost of their Norwood sublicenses under section 1253(d)(2) without regard to whether they were engaged in an active trade or business. However, this Court recently held that section 1253(d)(2) embodies a trade or business requirement despite the absence of a specific reference thereto. *Herrick v. Commissioner*, 85 T.C. 237 (1985). We must, therefore, decide whether petitioners were engaged in a trade or business.

The allowance of the claimed advertising deductions also hinges on the satisfaction of the trade or business requirement. Although advertising expense is generally an ordinary and necessary business expense, section 1.162-1(a), Income Tax Regs., no deduction is allowed for such expense unless the taxpayer is engaged in an active trade or business. Sec. 162.

---

[16]We note that section 1253(d)(2)(C) requires the Commissioner to issue regulations governing the method for ratably deducting unequal sublicense payments. However, the Commissioner has not yet issued permanent regulations under sec. 1253(d)(2)(C). Existing proposed regulations under sec. 1253 provide that a series of unequal payments will generally be deductible only if:

no such payment exceeds 20 percent of such principal sum and provided that no more than 75 percent of such principal sum is paid in the first half of the period of the transfer agreement or in the period of 10 consecutive taxable years which begin with the taxable year in which the first such payment is made, whichever period is shorter. [Sec. 1.1253-1(c)(3)(iv), Proposed Regs., 36 Fed. Reg. 13,150 (July 15, 1971).]

We take note of the fact that the payments required under the 1980 Norwood sublicenses do not run afoul of the limitation set forth in the proposed regulations.

The determination of whether a taxpayer's activities constitute the conduct of a trade or business is a question of fact requiring an examination of the particular facts in each case. *Higgins v. Commissioner*, 312 U.S. 212 (1941); *Koons v. Commissioner*, 35 T.C. 1092, 1100 (1961). The trade or business requirement of section 162 denies current deductions for expenses incurred prior to the time actual business operations commence and the activities for which the trade or business was formed are performed. *Johnsen v. Commissioner*, 83 T.C. 103, 114 (1984). Section 162 does not allow deductions for otherwise deductible expenses until such time as the trade or business begins to function as a going concern even though the taxpayer may have made a firm decision to enter into business and has expended considerable sums of money in preparation of commencing business. *Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965); *Owen v. Commissioner*, 23 T.C. 377, 381 (1954). Expenditures made before the actual commencement of a trade or business, preopening expenses, generally must be capitalized. These capitalized expenses may generally be depreciated or amortized over their useful life after the trade or business to which they are related actually commences. Sec. 167. However, an intangible capital asset that has an unlimited useful life may never be depreciated or amortized. Sec. 1.167(a)-3, Income Tax Regs.

## Barrow and Jackson

Respondent contends that neither Barrow nor Jackson was engaged in the trade or business of distributing player/recorders during 1978 and that the amortization and advertising expenses claimed should be disallowed. Based upon our consideration of all the facts and circumstances, we conclude that petitioners Barrow and Jackson were not engaged in the trade or business of distributing player/recorders pursuant to their individually owned sublicenses granted by Norwood during the taxable year 1978.

In late 1978, Barrow and Jackson were undoubtedly busily involved in attempting to turn Norris' invention into a profitable venture. During this period, Barrow and Jackson wore many hats. They acted as officers, directors, and

sole stockholders of Norwood, a newly formed corporation. They also entered into the J & G partnership, which had as its purpose the sale of Norwood sublicenses and the distribution of Norwood products as a territorial sublicensee. Barrow and Jackson, as individuals, also acquired Norwood sublicenses. Most of their actions, however, were taken in their role as officers and directors of Norwood. Any actions taken as individual sublicensees were prepatory to the commencement of a trade or business and did not constitute the active conduct of a trade or business.

In October of 1978, Barrow and Jackson began negotiations for the right to license the Norris XLP. Because the final licensing agreement executed on December 13, 1978, was between Norris and Norwood, as licensee, we conclude that Barrow and Jackson were acting in their capacities of officers or directors of Norwood throughout the negotiations. During 1978, Barrow and Jackson also commissioned a market research study, obtained a commitment for the manufacture of recorder/players from Atlas, and began selling territorial sublicenses throughout the country. These activities relate to the trade or business of Norwood, which is not an issue before us. Furthermore, petitioners made no sales during 1978, nor do we find that they made any legitimate efforts to locate potential buyers for the recorder/players. The only sale of the Norris XLP recorder/player during 1978 was made by Norwood for its own account.

The only activities that petitioners undertook in regard to their individual sublicenses in 1978 was the purchase of the sublicense from Norwood and the initial payment under the advertising cooperative agreement. Merely acquiring a license to distribute a product within a territory does not place a taxpayer in the trade or business of distributing that product. *Herrick v. Commissioner, supra* at 266. Furthermore, the payment of advertising costs does not clearly demonstrate the existence of a trade or business. Advertising expenses are ordinarily a type of ordinary and necessary expense for which a current deduction is allowed to an active trade or business. Sec. 1.162-1(a), Income Tax Regs. However, these particular payments for advertising are more properly viewed as a preopening expense incurred

in preparation of the actual commencement of a trade or business.

Because Barrow and Jackson were not in a trade or business during 1978, the Commissioner properly disallowed deductions claimed by petitioners for amortization and advertising expenses for that year.

## J & G

We must also decide whether J & G was actively engaged in a trade or business during 1978. The parties agree that J & G had $170,000 of gross income during 1978. All of the gross income of J & G for 1978 was from the sale of Norwood sublicenses and none from the sale of Norwood products. The partnership claimed license amortization expense of $80,000 and advertising expense of $90,000 resulting in net income for J & G of zero. Accordingly, Barrow and Jackson reported no income attributable to their 50-percent interests in J & G.

J & G was clearly in the business of selling Norwood sublicenses during 1978. Sales of sublicenses obtained from Norwood generated gross income of $170,000. A taxpayer, however, may be engaged in two or more distinct trades or businesses at one time. See also *Curphey v. Commissioner*, 73 T.C. 766, 775 (1980); *Wright v. Commissioner*, 31 T.C. 1264, 1267 (1959), affd. per curiam 274 F.2d 883 (6th Cir. 1960).

The offsetting amortization and advertising expenses claimed do not relate to the trade or business of selling Norwood sublicenses. Those expenses relate to the business of distributing Norwood products pursuant to the Norwood sublicenses retained by J & G. No deduction is allowable for those expenses unless J & G was engaged in the trade or business of distributing Norwood products in 1978. In deciding whether J & G was engaged in the trade or business of distributing Norwood products, we must look at the activities of Barrow and Jackson as partners, not to those actions of Barrow and Jackson as individual sublicensees or even as officers and directors of Norwood. Cf. *Goodwin v. Commissioner*, 75 T.C. 424, 437 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982).

All Barrow and Jackson did during 1978 as partners of J & G was to acquire several Norwood sublicenses and cause the partnership to make a payment to the advertising cooperative. Some of the Norwood sublicenses acquired by J & G were sold to third parties generating funds out of which the payment to the cooperative was made. Barrow and Jackson took no significant action to commence sales of Norwood products by J & G. No sales of Norwood products were, in fact, made by J & G during 1978. Nothing in the record indicates that Barrow and Jackson compiled lists of potential customers or established a distribution network within J & G's territories. Also, there is no indication that J & G purchased any inventory although petitioners claimed to have a small number of player/recorders available from Norris during 1978. Based on all of the foregoing, we conclude that J & G was not in the trade or business of distributing Norwood products during the taxable year 1978. The Commissioner properly increased the reportable distributive share of partnership income of Barrow and Jackson for the taxable year 1978 attributable to the disallowed license amortization and advertising expenses of J & G.

Although we have disallowed the amortization expense claimed by petitioners with respect to their individual Norwood sublicenses and the sublicenses held by J & G, petitioners may deduct the cost of those sublicenses over their remaining life under section 1253 if petitioners and J & G are engaged in a trade or business in subsequent years.[17]

The amounts expended by petitioners for advertising during the taxable year 1978 in regard to their sublicenses and those of J & G, however, are capitalized preopening expenses. As such, the advertising expenses will be amortizable in subsequent years in which petitioners or J & G or both are in the active trade or business of distributing Norwood products only if the advertising expenditures create an intangible asset with a determinable useful life. Sec. 167; sec. 1.167(a)-3, Income Tax Regs. Because the Norwood sublicenses purchased in 1978 may be extended beyond the initial 7-year term, first for 5 years and then

[17]Respondent apparently concedes that Barrow, Jackson, and J & G were actively conducting the trade or business of distributing Norwood products subsequent to 1978.

indefinitely on a year-to-year basis, we cannot say that the intangible asset created by the preopening advertising expense will benefit the trade or business of J & G or of the petitioners' individually for a "limited period, the length of which can be estimated with reasonable accuracy." Sec. 1.167(a)-3, Income Tax Regs. Therefore, petitioners will not be allowed to amortize in future years the advertising expense incurred in 1978, the current deduction of which we have already denied.

## Does Section 1253(d)(2) Require Actual Payment?

As an argument to the disallowance of license amortization deductions claimed by the Barrows, the Jacksons, and J & G with respect to the Norwood sublicenses for the taxable years in issue, respondent contends that, under section 1253, actual cash payment is a prerequisite to a deduction. If we accept respondent's contention, the "payment" of most of the sublicense obligations by executing and delivering nonrecourse notes does not support the amortization claimed over the term of the sublicenses under section 1253(d)(2)(A). Conversely, petitioners contend that the execution and delivery of recourse or nonrecourse notes can support the license amortization expense deductions.[18]

Section 1253(d)(1) deals with amounts "paid or incurred" that are contingent on the productivity, use, or disposition of an asset such as the Norwood sublicenses. The presence of the phrase "paid or incurred" demonstrates Congress' "general intent to give full meaning to the accrual system and to allow the accrual-basis taxpayer to deduct appropriate items that accrue, or are incurred, but are unpaid during the taxable year." *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 574 (1977). Section 1253(d)(2)(A), (B), and (C), however, mentions only "payment." The absence of phrases such as "paid or incurred" or "paid or accrued" in section 1253(d)(2) strongly suggests, and we conclude that all taxpayers, including accrual-basis taxpayers, are placed on a cash basis with respect to deductions under section 1253(d)(2). Nevertheless, section 1253(d)(2) modifies the cash basis by providing the allowable period over which a

---

[18]Respondent does not challenge the deduction based on the cash and recourse notes on this ground.

deduction may be claimed. Having concluded that section 1253(d)(2) requires more than mere accrual for the taxpayer to be entitled to a deduction, we must confront petitioners' contention that the execution and delivery of nonrecourse debt, such as the $309,000 notes given by Barrow and Jackson for the 1978 Norwood sublicenses, constitutes "payment."

The Supreme Court was confronted with a similar issue in *Don E. Williams Co. v. Commissioner, supra*. In that case, the Supreme Court had to decide whether the delivery of fully secured promissory demand notes to trustees of the taxpayer's qualified employees' profit-sharing trust was sufficient to allow a deduction for contributions "paid" under section 404(a). Section 404(a) provides rules of deduction for employer contributions to stock bonus, pension, profit-sharing, or annuity plans. After reviewing the legislative history of section 404(a), the Court concluded that all taxpayers were placed on the cash basis with respect to deductions claimed under this section. 429 U.S. at 578-579. The Court then endeavored to decide whether the delivery of the fully secured promissory demand notes prior to the end of the taxpayer's fiscal year constituted payment for purposes of section 404(a). The Court, in deciding that the demand notes delivered by the taxpayer to the trust did not constitute "payment," relied upon the legislative history of section 404(a) and distinguished contrary decisions in three Courts of Appeals. 429 U.S. at 578-579, 581-582. The Court also leaned heavily on the apparent policy behind the "payment" requirement of section 404(a): "To insure the integrity of the employees' plan." 429 U.S. at 579. The danger sought to be alleviated arises from the fact that the employer and the pension are quite often under common control. See 429 U.S. 583 (Stevens, J., concurring); see also *Don E. Williams Co. v. Commissioner*, 62 T.C. 166, 170-171 (1974), affd. 527 F.2d 649 (7th Cir. 1975). Justice Stewart, dissenting in *Don E. Williams Co.*, also recognized the danger to the integrity of the employees' plan where the contributions of the employer to the trust are illusory or without value. Nevertheless, he concluded that the delivery of negotiable, interest bearing, fully secured demand notes

satisfied the purpose of the "payment" requirement of section 404(a). 429 U.S. at 587-588.

We are, however, concerned with the meaning of the term "payment" as found in section 1253(d)(2), not the meaning of that term in section 404(a). Clearly, the terms "paid" or "payment" must be "defined in the context and in light of the purpose of the particular statute in which it is used." *Patmon, Young & Kirk Professional Corp. v. Commissioner*, 536 F.2d 142, 144 (6th Cir. 1976). While section 404(a) deals with employers and their employees' pension trusts, which are often under common control, section 1253 deals with the licensee/licensor relationship. Although in the instant case Barrow and Jackson, the licensees, effectively control Norwood, the licensor, the more typical licensee/licensor relationship arises from arm's-length bargaining by the parties. We do not believe that the "payment" requirement of section 1253(d)(2) was directed to correct any potential abuse that could arise from deductions claimed based upon related party transactions within the context of licensee/licensor relationships.

Section 1253 was enacted primarily to eliminate confusion as to the treatment by the transferor of the transfer of a franchise, trademark, or trade name. S. Rept. 91-552 (1969), 1969-3 C.B. 423, 555. If the transferor retains no significant right or continuing interest in the transfered property, he may treat the transfer as the sale or exchange of a capital asset.[19] If the transferor retains a significant power, right, or continuing interest as defined in section 1253(b)(2), then any payments received are treated as ordinary income. As to the transferee of a franchise, trademark, or trade name under section 1253, if the transfer is treated as the sale or exchange of a capital asset, then none of the cost may be recovered through depreciation deductions because the acquired asset will generally not have an ascertainable useful life. Sec. 1.167(a)-3, Income Tax Regs.; S. Rept. 91-552, *supra* 1969-3 C.B. at 555. Where, however, the transfer is not treated as a sale or exchange of a capital asset as to the transferor, section 1253(d) allows the transferee to deduct the payments made pursuant to the transfer. If such

---

[19]This is true provided that the franchise, trademark, or trade name is otherwise a capital asset in the transferor's hands. Sec. 1221.

payments are contingent on the productivity, use, or disposition of the asset, section 1253(d)(1) allows a deduction for payments made by the transferee pursuant to section 162. Where the transferee is obliged to make a single lump-sum payment or to make a series of noncontingent payments, section 1253(d)(2) generally allows those payments to be deducted over the shorter of the term of the transfer agreement or 10 years.[20] In every instance, however, the timing of deductions under section 1253(d)(2) is triggered by "payment," not mere accrual. The reason for the requirement of "payment" and the control over the timing of the deductions of section 1253(d)(2) is not apparent from the legislative history. Perhaps it was viewed as unfair to allow either the current accrual of an expense or even the current deduction of actual payments when the transferee was governed by section 1253(d) where, if the transferee was required to treat the transfer as the purchase of an intangible capital asset, no deduction could ever be taken. Whatever the purpose may have been for the "payment" requirement, that purpose would not seem to require actual cash or cash equivalent payment. For this reason, we find that the use of notes or other valuable property can constitute payment under section 1253(d)(2). Of course, if the note or property "paid" is demonstrated to be illusory or without value, then it can never be "payment" under any circumstance. Provided that the interest bearing nonrecourse notes given by the Norwood sublicensees in satisfaction of their obligations under the sublicense agreements are otherwise free from infirmity, we find that the delivery of that note is "payment" under section 1253(d)(2).

### Estate of Franklin Issue

Respondent argues that, under the authority of *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), and other cases, the nonrecourse notes executed by the sublicensees in satisfaction of their sublicense obligations were not bona fide and that the amortization deductions based thereon should not be allowed.

---

[20]These payments must also be made in the conduct of a trade or business.

In *Estate of Franklin v. Commissioner* the taxpayer's decedent was one of eight limited partners in a limited partnership formed to acquire real property and improvements for a total sales price of $1,224,000 plus interest, payable in monthly installments of principal and interest for a period of 10 years. In addition to the monthly payments, the sales agreement provided for a balloon payment of approximately $975,000 at the end of 10 years. The limited partnership's obligations under the sales agreement were without recourse. The fair market value of the property was no more than $700,000. Nonetheless the partnership included the full amount of the nonrecourse indebtedness in its basis upon which deductions for depreciation were based. The depreciation and interest deductions claimed by the partnership generated losses, part of which the taxpayer's decedent deducted as his distributive share of partnership losses.

On appeal of this Court's disallowance of the losses claimed by the taxpayer's decedent, the Ninth Circuit focused on the relationship of the fair market value of the property and the amount of nonrecourse debt. The court reasoned that if a taxpayer acquires property with nonrecourse financing that approximates the fair market value of the property, he will, under normal circumstances, acquire an equity in the property as the principal amount of the debt is reduced. From an economic standpoint, the buyer then has an interest in the property that he will not readily abandon. Such a situation justifies the identical treatment of recourse and nonrecourse debt dating back at least to the Supreme Court's opinion in *Crane v. Commissioner*, 331 U.S. 1 (1947), where the Court said "an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations." 331 U.S. at 14.

The Ninth Circuit concluded that the partners in *Estate of Franklin* would not feel compelled to treat the installment debt with the balloon payment as their personal obligation because the purchase price substantially exceeded a reasonable estimate of the value of the property. Therefore, the Ninth Circuit found the partnership's nonrecourse

obligations under the purchase agreement not bona fide and denied their inclusion in the partnership's basis for the property. 544 F.2d at 1049.[21]

Respondent's reliance on *Estate of Franklin* in the instant case is misplaced because the facts of that case are distinguishable from those before us. Barrow, Jackson, and J & G had obligated themselves to pay $160,000 for each Norwood sublicense acquired in 1978. Each Norwood sublicense was worth $160,000. Because not all of the purchase price was represented by nonrecourse debt, they had some equity in the sublicenses to protect, and we must accept the nonrecourse notes as bona fide. The principal holding of *Estate of Franklin* is only triggered when the nonrecourse financing substantially exceeds the fair market value of the subject property. 544 F.2d at 1048. Petitioners here, unlike the taxpayers in *Estate of Franklin*, were confronted with a "situation in which it [was] presently reasonable from an economic point of view for [them] to make a capital investment in the amount of the unpaid purchase price." 544 F.2d at 1049. Similarly, J & G had a substantial equity to protect in the sublicenses it purchased in 1979 because it executed recourse debt with principal balances totaling $125,000 in satisfaction of its first year obligations under those sublicenses.[22] Likewise, although the purchase price for the sublicenses purchased by Barrow and Jackson in 1980 were $250,000, the notes they executed during 1980 were with recourse.

Despite respondent's arguments to the contrary, we are satisfied that petitioners have proven a fair market value of $160,000 for each Norwood sublicense. Petitioners substantiated the claimed value based upon predicted capitalized earnings from the sublicenses. Furthermore, petitioners demonstrated that an offer was made to purchase the sublicenses in 1983. The prospective purchaser was willing to assume liability for all the remaining principal balance on

---

[21]Several subsequent cases have applied the rationale of *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), to exclude nonrecourse debt from the basis of encumbered property. *Odend'hal v. Commissioner*, 80 T.C. 588, 604 (1983), affd. 748 F.2d 908 (4th Cir. 1984); *Houchins v. Commissioner*, 79 T.C. 570, 598 (1982); *Siegel v. Commissioner*, 78 T.C. 659, 685 (1982); *Brannen v. Commissioner*, 78 T.C. 471, 493 (1982), affd. 722 F.2d 695, 701 (11th Cir. 1984); *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir. 1982).

[22]Neither Barrow nor Jackson purchased any additional sublicenses during 1979.

the nonrecourse liability of the sublicensees up to a total of $145,500 for each sublicense. The prospective purchaser was also willing to make additional cash payments to Norwood to gain its approval of and cooperation in the assignment of the sublicenses. Respondent did not introduce any evidence of the value of the sublicenses. Respondent did not offer the testimony of any witness as to the value of the sublicenses. Respondent contented himself with charging that the offer to assume the nonrecourse debt by the prospective purchaser should not be considered as any indication of the value of the sublicenses. We have before us no evidence of any side agreements to forgive or to otherwise ignore the nonrecourse notes given by the sublicensees. Petitioners have met their burden of proof with respect to the value of the nonrecourse indebtedness. Rule 142(a).

We recognize that the equity petitioners had in the 1978 Norwood sublicenses could, in a sense, be very small. For example, the large nonrecourse indebtedness required for the 1978 Norwood sublicenses was due at the end of the initial 7-year term. If the sublicenses were nonrenewable, petitioners could have no incentive to pay off the nonrecourse debt because their equity would disappear regardless of whether they paid the debt. Here, however, petitioners could renew the sublicenses, but only if they were not in default on their initial sublicense obligations. We are not prepared to hold that the renewal option had no value and, that, therefore, petitioners would not be economically prompted to pay off the initial nonrecourse debt of $415,500 when it fell due on December 1, 1985. Furthermore, the test of *Estate of Franklin* focuses on whether it was "presently reasonable" to make an investment in the property to the extent of the unpaid purchase price. 544 F.2d at 1049. Given that petitioners had equity in their Norwood sublicenses regardless of the year purchased to the extent of their cash investment and their recourse notes, we find the nonrecourse debts to be bona fide during the taxable years in issue.

### Are the Sublicense Notes Excessively Contingent?

Where an obligation used to purchase property, by its terms, requires the amount or fact of the repayment

obligation to hinge on some uncertain future event, the probability of such a contingency occurring may be so remote as to preclude inclusion of the obligation in the taxpayer's tax basis for the property. Respondent argues that because several of the sublicensing agreements and advertising cooperative nonrecourse notes provide for repayments determined by the number of Norwood units sold within the sublicense territories that the obligations are excessively contingent and that they cannot support license amortization and advertising expense deductions. In support of this argument, respondent cites several analogous cases that denied the inclusion of contingent debt obligations in the calculation of the basis of property financed by the debt. *Denver & Rio Grande Western R.R. Co. v. United States*, 205 Ct. Cl. 597, 505 F.2d 1266 (1974); *Estate of Baron v. Commissioner*, 83 T.C. 542 (1984); *Saviano v. Commissioner*, 80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985); *Graf v. Commissioner*, 80 T.C. 944 (1983); *Lemery v. Commissioner*, 52 T.C. 367 (1969), affd. on other grounds 451 F.2d 173 (9th Cir. 1971).

Although the nonrecourse notes given by petitioners in satisfaction of their obligations under the sublicenses provided for repayments based on the number of units sold, we do not find that this feature, standing alone, makes the notes too contingent. The notes were not payable solely based on sales; although some of the liability was nonrecourse, it all contained definite due dates. The provision requiring payments based on sales can be viewed as merely requiring prepayments and not providing the sole method of repayment. In contrast, most of the cases cited by respondent dealt with debt that was repayable solely out of the profit or revenues from, or other contingency surrounding, the venture. *Estate of Baron v. Commissioner*, *supra* at 550 (depreciation deductions for master recording based upon $460,000 nonrecourse note payable solely from record sales proceeds denied); *Saviano v. Commissioner*, *supra* at 961-965 (no deduction for mining development costs under section 616(a) based upon nonrecourse debt payable solely from mining proceeds); *Graf v. Commissioner*, *supra* at 953 (note payable solely out of profits from sale of properties created by dredging operations); *Denver & Rio*

*Grande Western R.R Co. v. United States*, 505 F.2d at 1270 (liabilities incurred to finance railroad line and which were payable based on percentage of freight traffic revenue were too contingent to be included in cost basis); *Lemery v. Commissioner, supra* at 377 (obligation contingent upon net profit from business). We find other cases cited by respondent unpersuasive because the contingent liability in those cases could either be easily avoided by the obligor or the parties did not anticipate it would ever be paid. *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. 834, 848 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966), cert. denied 385 U.S. 827 (1966); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831, 840 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964).

## Application of the At-Risk Rules

Even if the deductions claimed by the Barrows, the Jacksons, and J & G with respect to their Norwood sublicenses are otherwise allowable, we must determine if any of the post-1978 losses generated by the deductions are disallowed by the at-risk rules of section 465.

Prior to the enactment of section 465, the loss a taxpayer could claim with respect to an activity was limited only by the taxpayer's cost or other tax basis in the investment. Basis includes not only the amount of cash invested and the amount of liabilities assumed by the taxpayer with respect to the venture for which the taxpayer is personally liable, but also may include any nonrecourse liabilities of the taxpayer. *Crane v. Commissioner*, 331 U.S. 1 (1947). Before 1976, because of the inclusion of nonrecourse debt in basis, in many situations a taxpayer was entitled to deduct losses generated by the activity substantially in excess of the amount for which he was economically at risk. S. Rept. 94-1236 (1976), 1976-3 C.B. (Vol. 3) 807, 815. Congress enacted section 465 to combat this potentially abusive situation. Sec. 204(a), Tax Reform Act of 1976, 90 Stat. 1531. In its original form, section 465 was aimed at losses generated in investment vehicles historically used as tax shelters, including the trade or business of holding, producing, or distributing motion pictures or video tapes, or exploring for, or exploiting, oil and gas resources. Sec.

465(c)(1). Congress later extended the at-risk rules to include almost all activities other than real estate engaged in by the taxpayer in carrying on a trade or business or for the production of income. Sec. 201, Revenue Act of 1978, 92 Stat. 2814. As extended, the at-risk rules apply to the trade or business of distributing Norwood products pursuant to a territorial sublicense.

Section 465 (for the taxable years involved here) applies to individuals, S corporations, and personal holding companies. Furthermore, the at-risk rules of section 465 apply only to losses. Section 465 operates by limiting deductions for losses incurred from covered activities to the extent of the amount that the taxpayer is at risk with respect to the activities. Sec. 465(a). Generally, a taxpayer is considered at risk for an activity with respect to the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity. A taxpayer's at-risk amount also includes, with limitations, amounts borrowed with respect to the activity. Amounts at risk are determined as of the end of each taxable year. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 86. We must, therefore, determine petitioners' amounts at risk at the end of each taxable year in issue.[23]

## 1979

As an individual sublicensee engaged in the trade or business of distributing Norwood products, Barrow incurred a loss of $11,334, which petitioners Barrow reported on Schedule C, Profit or (Loss) From Business or Profession, for the taxable year 1979.[24] Because Barrow had a loss subject to the at-risk rules for the taxable year 1979, we must determine to what extent, if any, he was at risk at the end of 1979.

As set forth earlier, Barrow made a cash payment of $8,000 with respect to his Norwood sublicenses during 1978. He also executed and delivered to Norwood an interest-bearing recourse note with a principal balance of $4,000 and an interest-bearing nonrecourse note with a principal balance of $309,000. Furthermore, Barrow executed an interest-

---

[23]Although we have found that neither petitioners nor J & G were engaged in an active trade or business during the taxable year 1978, we point out that the expanded coverage of the at-risk rules was not effective until after 1978. Sec. 204, Revenue Act of 1978, 92 Stat. 2817.

[24]Jackson did not incur a loss from his individually owned Norwood sublicenses during 1979.

bearing nonrecourse note with a principal balance of $39,000 with respect to the advertising cooperative agreement required as part of the licensing agreement. Barrow made no other cash payments in 1979 nor did he execute any other promissory notes respecting the sublicenses he acquired in 1978.

Section 465(b) provides a specific exclusion from the amount considered at risk for "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4). Therefore, Barrow may not include any portion of the nonrecourse debts in his at-risk amount.

Section 465(b) also limits the amount of recourse debt that Barrow may include in his amount at risk. Section 465(b)(3) provides:

> (3) Certain borrowed amounts excluded.— * * * amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who—
>> (A) has an interest (other than an interest as a creditor) in such activity, or
>> (B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b).

If Norwood has either an interest in the distribution of Norwood products by Barrow or a prohibited relationship with Barrow as defined in section 267(b), the recourse indebtedness is not includable in his amount at risk.

Section 465(b)(3) was enacted as part of the original at-risk rules effective for years beginning in 1976. When Congress expanded the scope of the at-risk rules in the Revenue Act of 1978 to encompass activities such as the distribution of Norwood products, it considered the potential effect of the 465(b)(3) limitations on recourse debt incurred in regard to the newly covered at-risk categories.[25]

---

[25]The Commissioner was directed by Congress to prepare regulations applying sec. 465(b)(3) to the activities newly made subject to the at-risk provisions. H. Rept. 95-1445 (1978), 1978-3 (Part 1) C.B. 181, 243-244. Permanent regulations under sec. 465 still have not been issued. The Commissioner did issue proposed regulations covering sec. 465 on June 5, 1979. Those proposed regulations provide:

(b) *Loans for which the borrower is personally liable for repayment*—(1) *General rule.* If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity.

[Sec. 1.465-8(b), Proposed Regs., 44 Fed. Reg. 32,239 (June 5, 1979).]

Respondent argues that because the nonrecourse notes given by Barrow to Norwood in satisfaction of his obligations under the 1978 Norwood sublicenses, which we have already excluded from his amount at risk, are prepayable based upon a dollar amount per unit sold, Norwood "has an interest (other than an interest as a creditor) in such activity." Clearly, Norwood was interested in the success of Barrow in distributing Norwood products because Norwood would receive prepayments on the license agreement or advertising cooperative nonrecourse notes based on sales. Nevertheless, the requisite interest other than as a creditor must, we believe, be either a capital interest in the activity or an interest in the *net* profits of the activity.[26] The payment provisions in the nonrecourse notes for payment based on sales do not give Norwood an interest other than as a creditor under section 465(b)(3)(A).

Alternatively, respondent argues that Barrow may not include the recourse debt to Norwood in his amount at risk because he has a relationship to Norwood described in section 465(b)(3)(B).[27] Section 465(b)(3)(B) directs us to section 267(b), which enumerates the prohibited relationships including the following:

(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

Although Barrow directly owns only 50 percent of the outstanding stock of Norwood, this does not stop our inquiry because his indirect ownership in Norwood creates the prohibited relationship found in section 267(b)(2). Section 267(c) attributes, for purposes of section 267(b), to an individual stockholder in a corporation any stock owned, directly or indirectly, by a partner of the individual. By application of section 267(c), Barrow is treated as owning

---

The regulation continues:

(3) *Interest in net profits.* For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity. [Sec. 1.465-8(b), Proposed Regs., *supra.*]

[26]See sec. l.465-8(b), Proposed Regs., *supra.*

[27]The exclusion from amounts at risk of recourse loans from related persons was substantially amended by sec. 432(c) of the Tax Reform Act of 1984, 98 Stat. 811, 814, effective generally for taxable years beginning after Dec. 31, 1983.

the 50-percent ownership of Norwood owned by his partner in J & G, Jackson. Because Barrow has direct and indirect ownership of 100 percent of the stock of Norwood, no part of the recourse debt may be included in his amount at risk. Therefore, his only amount at risk is derived from his cash contribution of $8,000 and any losses will be limited to that extent. Losses in excess of Barrow's amount at risk are allowable to the extent that his amount at risk increases in future years.

Although neither Barrow nor Jackson purchased any additional Norwood sublicenses individually during 1979, they did cause J & G to purchase five additional sublicenses. J & G's annual obligation for these five territories was $125,000, which it satisfied for the taxable year 1979 by executing recourse notes in the amounts of $75,000 and $50,000. J & G satisfied its $35,000 per territory advertising cooperative obligation for the sublicenses purchased in 1979 by executing and delivering recourse notes with a total principal amount of $40,797 and nonrecourse notes with a total principal balance of $134,203. It is upon these notes that J & G claimed license amortization in the amount of $149,000 and advertising expense in the amount of $40,797. These deductions were used to completely offset income from the sale of Norwood sublicenses of $189,797. As a result of the offsetting income and deductions claimed by J & G, neither the Barrows nor the Jacksons reported any amount as the distributive share of J & G partnership income.

Partnerships are not explicitly included in the coverage of section 465. The legislative history makes clear, however, that "The limitation applies to all taxpayers * * * including * * * partners in a partnership." S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 86; *Peters v. Commissioner*, 77 T.C. 1158, 1163 n. 5 (1981). The reason partnerships are omitted from section 465 is that they are not taxpayers, but merely reporting entities. The partners are the taxpayers and our inquiry must ultimately focus on the partners. Sec. 701; 3 A. Willis, J. Pennell & P. Postlewaite, Partnership Taxation, sec. 51.03 (3d ed. 1985). Having concluded that the at-risk rules of section 465 will apply to any losses incurred by J & G and reported by its partners, we must inquire whether

there were any losses from covered activities during the taxable year 1979. For purposes of the at-risk rules, the term "loss" is defined as:

the excess of the deductions allowable under this chapter for the taxable year * * * and allocable to an activity * * * over the income received or accrued by the taxpayer during the taxable year from such activity. [Sec. 465(d).]

During the taxable year 1979, J & G engaged in selling Norwood sublicenses and in distributing Norwood products pursuant to the retained Norwood sublicenses. If we were to view the results of operations from these two endeavors together, there is no loss, but rather net income of zero. If, however, we were to view the sales of Norwood sublicenses as an activity separate from the distribution of Norwood products, we would see one net profit, clearly exempt from the reach of section 465, and one net loss, which would be subject to the at-risk limitation. We must, therefore, grapple with the aggregation-of-activities rules under section 465 to determine if the at-risk rules apply to petitioners with respect to the results of operations of J & G for the taxable year 1979.

When Congress extended the reach of the at-risk rules in 1978, it enacted provisions concerning the aggregation of activities. Sec. 201, Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2814-2815. The aggregation rules of section 465(c)(3) below apply only to those activities that were brought under the at-risk rules in 1978 and not to the original categories:

(3) EXTENSION TO OTHER ACTIVITIES.—

(A) IN GENERAL.—In the case of taxable years beginning after December 31, 1978, this section also applies to each activity—

(i) engaged in by the taxpayer in carrying on a trade or business or for the production of income, and

(ii) which is not described in paragraph (1).

(B) AGGREGATION OF ACTIVITIES WHERE TAXPAYER ACTIVELY PARTICIPATES IN MANAGEMENT OF TRADE OR BUSINESS.— Except as provided in subparagraph (C), for purposes of this section, activities described in subparagraph (A) which constitute a trade or business shall be treated as one activity if—

(i) the taxpayer actively participates in the management of such trade or business, or

(ii) such trade or business is carried on by a partnership or electing

small business corporation (as defined in section 1371(b)) and 65 percent or more of the losses for the taxable year is allocable to persons who actively participate in the management of the trade or business.

(C) AGGREGATION OR SEPARATION OF ACTIVITIES UNDER REGULATIONS.—The Secretary shall prescribe regulations under which activities described in subparagraph (A) shall be aggregated or treated as separate activities.

[Sec. 465(c)(3).][28]

Essentially, these aggregation rules provide for the aggregation of all activities for purposes of the applications of the at-risk rules if those activities form a single trade or business. Our previous conclusion that the distribution of Norwood products and the sale of Norwood sublicenses constitute distinct trades or businesses of J & G, a partnership in which Barrow and Jackson actively participate in management, requires the separate application of the at-risk rules to those businesses by J & G under section 465(c)(3)(B). Because J & G had net income and claimed no deductions with respect to its trade or business of selling Norwood sublicenses, the at-risk rules are not applicable to this trade or business. The at-risk rules will apply, however, to any loss incurred by J & G in the distribution of Norwood products during the taxable year 1979.

J & G filed Form 1065, U.S. Partnership Return of Income, for the taxable year 1979 showing gross receipts or sales of $189,797. This return does not reveal what portions of the $189,797 revenue are from sales of Norwood sublicenses and the sale of Norwood products. We have found that J & G had sales of Norwood products of $27.03. Because J & G claimed deductions of $189,797 for the taxable year 1979 all relating to the sale of Norwood products, and because J & G had revenues from this activity of no more than $27.03, Rule 142(a), J & G incurred a loss from an activity subject to the at-risk rules in the amount of $189,769.97. Sec. 465(d). Each petitioner's distributive share of this loss was $94,884.98. Given that petitioners had losses subject to the at-risk rules for the taxable year 1979, we must decide what amount, if any, for which they are at risk.

---

[28]Sec. 465(c)(3) is applicable to taxable years beginning after Dec. 31, 1978. Sec. 204, Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2817.

J & G made cash payments to Norwood of $16,000 in 1978 with respect to the 1978 sublicenses it acquired. J & G also executed nonrecourse notes in the amounts of $618,000 and $88,000 for its obligations under the 1978 sublicense and advertising cooperative agreements, respectively. J & G did not make any cash payments in the taxable year 1979 in regard to either the 1978 sublicenses or the sublicenses it acquired during 1979. J & G executed several notes in satisfaction of its obligations under the 1979 sublicense and advertising cooperative agreements. On December 31, 1979, petitioners executed, as partners of J & G, recourse notes with principal balances totaling $125,000 with respect to the 1979 sublicense agreements and other recourse and nonrecourse notes with respect to the advertising cooperative agreements with principal balances totaling $40,797 and $134,203, respectively.

After our disallowance of deductions claimed by J & G during 1978, the partnership had net income of $170,000. Normally, each partner's basis with respect to his partnership interest would be increased in the amount of his distributive share of partnership income. S. Rept. 94-938, 1976-3 C.B. (Vol. 3) 49. However, for purposes of the at-risk rules the inquiry is the amount at risk with regard to *each* activity. We have previously concluded that J & G was involved in two activities, one subject to the at-risk rules of section 465 because it generated a loss, the other immune because it resulted in net income. Because all of J & G's income from 1978 was from the activity engaged in by the partnership that was not subject to the at-risk rules, petitioners will not be allowed to include their distributive share of partnership income earned from that activity in their amount at risk with respect to the activity subject to the limitations of section 465.

Neither Barrow nor Jackson made any direct capital contribution to J & G during 1978 or 1979. The source of the $16,000 payment from J & G in 1978 to Norwood appears to have been revenues received from the sale of Norwood sublicenses. Although neither Barrow nor Jackson may include any amount of the partnership's income from selling Norwood sublicenses in their respective amounts at risk for the separate partnership activity of distributing Norwood

products, they may treat the cash payment by the partnership to Norwood as cash contributed to the latter activity. The cash received by the partnership from selling Norwood sublicenses was a partnership asset. Under the rules of the Uniform Partnership Act, which Utah has enacted, a partner has limited ownership rights in specific partnership property as a tenant in partnership. Utah Code Ann. secs. 48-1-21 and 48-1-22 (1981). So, in a sense, the cash held by the partnership was the property of its partners and, therefore, treatable as if paid by them to Norwood with respect to the activity of distributing Norwood products. Therefore, each partner will be entitled to include in his amount at risk for the activity of distributing Norwood products his share of the cash paid by J & G to Norwood.

The only other source of potential amounts at risk for petitioners is their liability at the end of the taxable year 1979, if any, for the debt obligations undertaken by J & G regarding the activity of distributing Norwood products.

At the end of the taxable year 1979, J & G had nonrecourse and recourse debt obligations with principal amounts totaling $840,203 and $165,797, respectively. Each petitioner's share of partnership debt includable in the amount at risk for the activity of distributing Norwood products would be $420,101.50 for the nonrecourse debt and $82,898.50 for the recourse debt. However, neither Barrow nor Jackson will be allowed to include their share of the nonrecourse debt of J & G in their respective amounts at risk because of the prohibition found in section 465(b)(4).

Finally, we must determine whether Barrow and Jackson are entitled to include their distributive share of the recourse debt of J & G in their amounts at risk. As we decided with respect to the obligations incurred by Barrow for his individual 1978 sublicenses, the repayment provisions of the J & G notes given to Norwood do not give Norwood an interest other than as a creditor under section 465(b)(3)(A). We must also look to see if a relationship prohibited by section 465(b)(3)(B) exists such that Barrow and Jackson will be precluded from including recourse debt of J & G in their amounts at risk.

Although J & G was indebted to Norwood as represented by the recourse notes with respect to the 1979 sublicenses,

we must see if Barrow and Jackson, as the taxpayers, have one of the enumerated relationships with Norwood. Because they are partners, Barrow and Jackson will have constructive ownership of the share of Norwood directly owned by the other. Therefore, Barrow and Jackson each have indirect and direct ownership of Norwood totaling 100 percent, thereby creating one of the relationships described in section 267(b). Sec. 267(c)(3); sec. 465(b)(3)(B). The recourse debt cannot be considered "at risk."

Based upon the foregoing, the only amount at risk of Barrow and Jackson with respect to the activity of distributing Norwood products through the J & G partnership at the end of 1979 was their share of the $16,000 cash payment made by J & G to Norwood in 1978.

## 1980

The Barrows and the Jacksons each reported net losses with respect to their individual Norwood sublicenses for the taxable year in the amounts of $112,551 and $123,804.84, respectively. During 1980, Barrow and Jackson each made cash payments with respect to their individual sublicenses totaling $7,000, $2,000 under the 1980 sublicense agreement, $1,000 under the 1980 advertising cooperative, and $4,000 as a principal payment on notes from prior years.[29] These payments are included in their amounts at risk. Sec. 465(b)(1)(A). However, recourse notes in the amounts of $48,000 and $69,000, respectively, will not increase their amounts at risk because Barrow and Jackson have one of the specified relationships to the lender, Norwood. Sec. 465(b)(3)(B). Therefore, the losses for the taxable year 1980 from the activity of distributing Norwood products via their individual sublicenses will be limited to $7,000.[30]

---

[29]Barrow and Jackson each also paid $591 in interest during 1980.

[30]In his statutory notices of deficiency, the Commissioner determined the amount of distributable partnership income of Jackson and Barrow from J & G for the taxable year 1980 to be $37,924 and $35,549, respectively. The statutory notice of deficiency provided no basis for the adjustment to the partnership income. Neither party argued on brief the propriety of this determination. Mindful that the Commissioner's determination is presumptively correct, we find that petitioners have not met their burden of proof as to the correct amount of their distributive shares of partnership income for the taxable year. Rule 142(a).

No additional sublicenses were purchased by Barrow, Jackson, or J & G during the taxable year 1981. The Commissioner did not issue a statutory notice of deficiency to Jackson for the taxable year 1981, so we need only concern ourselves with the tax liability of Barrow.

Barrow had gross income from his Norwood sublicenses of $5,470 for the taxable year 1981. The Barrows claimed a deduction with respect to the sublicenses of $45,286, which created a net loss of $39,816. The deductions claimed included a deduction for amortization of the 1978 Norwood sublicenses of $40,000 plus a further deduction of $3,997 for "License Fee." During the taxable year 1981, Barrow made cash payments totaling $38,550 with respect to his Norwood sublicenses.

The Commissioner disallowed the amortization deduction of $40,000.[31] Therefore, we must once again decide the impact of the at-risk rules on the allowance of the loss generated by the trade or business of distributing Norwood products.

We have concluded for prior years that only the cash payments made directly or indirectly by Barrow to Norwood with respect to the activity of distributing Norwood products are includable in his amount at risk. Because a deduction was allowed to the extent of those amounts, his amount at risk was again reduced to zero. Sec. 465(b)(5). Furthermore, because Barrow did not borrow any additional amounts with respect to this activity during 1981, his amount at risk is increased only by the cash payments he made during the year, $38,550. Losses from this activity will, therefore, be limited to $38,550.

### Does the Statute of Limitations Bar Assessment Against J & G?

Petitioners Jackson assert that the additional deficiency determined with respect to the proper distributive share of

---

[31]The Commissioner also disallowed the additional license fee expense of $3,997. We must uphold the Commissioner's determination that the Barrows failed to prove that this deduction was properly allowable. Rule 142(a). No evidence was introduced nor any argument made on brief suggesting the source of the liability giving rise to the claimed deduction. There is no record showing that this expense was paid or otherwise properly accrued.

J & G partnership income for the taxable year 1978 is barred by the 3-year period of limitations found in section 6501. The ground for this assertion is that this additional deficiency was first determined by way of respondent's answer to their petition in this case on August 19, 1982, more than 3 years after the J & G partnership return for the taxable year 1978 was filed.[32] We find this contention unpersuasive.

Although required to file an annual information return under section 6031, a partnership is generally not subject to tax. Sec. 701. The partnership return is for information purposes and must provide the names and addresses of all persons entitled to share in the partnership taxable income. It is the partners, not the partnership, who are taxable on the partnership income. Sec. 702. Because the statute of limitations generally requires the assessment of any tax to be made within 3 years after the return is due, and because Jackson, as a partner of J & G, is taxable on his share of partnership income, we must decide whether the period of limitations on assessment expired with respect to the Jacksons' individual return, and not the partnership return.

A partner is required to report his distributive share of partnership income based upon the "income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner." Sec. 706(a). Because the Jacksons and J & G were each calendar year taxpayers, the Jacksons were required to report the distributive share of partnership income from J & G for the partnership taxable year 1978 on their income tax return for the taxable year 1978. Inasmuch as the running of the period of limitations for the assessment of tax against the Jacksons' 1978 return was suspended by the issuance by the Commissioner of a statutory notice of deficiency on April 2, 1982, sec. 6503(a), the additional assessment of tax in the Commissioner's answer to the Jacksons' petition was not barred by the expiration of the period of limitations.

---

[32]Form 1065, U.S. Partnership Return of Income, for 1978 was signed on Apr. 14, 1979. No argument has been raised as to the timeliness of this return.

## Additions to Tax

*Section 6651(a)*

The Commissioner determined additions to the tax liability under section 6651(a) for the Barrows for the taxable years 1978, 1979, 1980, and 1981. Section 6651(a) imposes an addition to tax for the failure to file a required return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." To avoid the addition to tax, the taxpayer must prove both (1) that the failure to file was due to "reasonable cause," and (2) that the failure did not result from "willful neglect." Sec. 6651(a); *United States v. Boyle*, 469 U.S. 241, 245 (1985). The burden of proof falls upon petitioner. *Ehrlich v. Commissioner*, 31 T.C. 536, 540 (1958); Rule 142(a).

For purposes of section 6651(a) "reasonable cause" has been defined as the exercise of "ordinary business care and prudence." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Barrow asserts that "reasonable cause" for failure to file timely returns for the years in issue was shown by his reliance on his tax advisor:

He looked at my tax return and the preliminary information that we got together and informed me that I had no tax liability, in any event, because I was so far in the hole with everything that I had done. Therefore, I wouldn't have to worry about any cost or penalties in the taxes, so we could take the time that we needed to get all the stuff together that I had to go and look for. He wasn't in any hurry to get it done. Even when I got the information to him, it took a long time for him to finally get around to getting it done.

It appears, then, that the Barrows relied upon their tax advisor in two ways: (1) To actually prepare the return, and (2) to advise on the need to file. As to the Barrows' reliance on their advisor to prepare and timely file the return, the Supreme Court has recently decided that such reliance does not constitute reasonable cause. *United States v. Boyle*, 469 U.S. at 250-251. As to the advice of the advisor that no timely return need be filed because the Barrows would incur no additions to tax because they had no tax liability, we find the Barrows' reliance on this advice unreasonable. Their advisor did not advise Mr. Barrow that no return was due, nor that timely filing was not necessary, but only that

he would incur no additions to tax for failure to file. The advice given turned out to be wrong because of the deficiencies determined by the Commissioner. We find that the Barrows must bear the burden of this error. We point out that this is very different from the situation where a tax advisor counsels, even erroneously, that no return need be filed. Such reliance can, in a given instance, constitute reasonable cause. *United States v. Boyle*, 469 U.S. at 251.

We are also unmoved by Barrow's assertions that his involvement in the business of Norwood and extensive travel overseas caused him to neglect his personal affairs. The record does not reveal that Barrow was out of the country on the filing due dates for any of the years in issue. Petitioners have failed to meet their burden of proof, Rule 142(a); therefore, the additions to tax under section 6651(a) are proper.[33]

*Section 6653(a)*

Finally, we must determine if the Commissioner properly determined deficiencies in petitioners' liability for additions to tax under section 6653(a). Section 6653(a) imposes an addition to tax equal to 5 percent of the underpayment whenever an underpayment of tax is due to negligence or intentional disregard of rules or regulations. To avoid the addition to tax under section 6653(a), petitioners must show that no part of any underpayment of income taxes was due to negligence. *Marcello v. Commissioner*, 380 F.2d 499, 505-507 (5th Cir. 1967).

The reporting position adopted by petitioners with respect to amortization and advertising expense deductions claimed regarding the Norwood sublicenses was based on the legal opinion of competent tax counsel. The offering circular prepared each year for the Norwood sublicenses offered for sale contained a legal opinion as to the tax treatment of the transactions. Although the tax opinion turned out to be substantially erroneous, we do not think that petitioners' reliance thereon was unreasonable. See *United States v. Boyle*, 469 U.S. at 250-251. For this reason

---

[33]Because we find that the Barrows did not have reasonable cause for the failure to file income tax returns, we do not need to address the question of whether the failure to file was also caused by willful neglect. Sec. 6651(a); see *United States v. Boyle*, 469 U.S. 241, 247-248 (1985).

we decline to impose the addition to tax under section 6653(a).

Based on the foregoing,

*Decisions will be entered under Rule 155.*