CHRISTOS COUTSOUBELIS AND FRANCES COUTSOUBELIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coutsoubelis v. Commissioner
Docket No. 8412-91
United States Tax Court
T.C. Memo 1993-457; 1993 Tax Ct. Memo LEXIS 465; 66 T.C.M. (CCH) 934; September 29, 1993, Filed *465 Decision will be entered under Rule 155. For petitioners: Herbert L. Zuckerman, Robert J. Alter, and Richard J. Sapinski.
For respondent: Craig Connell, Richard E. Buchbinder, and Ismael Gonzalez. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies and additions to income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1) [1] Sec. 6653(b)(2) Sec. 6661
1984
$ 45,523
$ 22,762
[2]
$ 11,381
1985
71,990
35,995
[2]
17,998
Year
Deficiency
Sec. 6653(b)(1)(A) [1]
Sec. 6653(b)(1)(B)
Sec. 6661
1986
42,347
28,171
[2]
10,587
Respondent also determined that petitioners are liable for additions to tax for negligence under section 6653(a)(1) and (2) for 1984 and 1985, and section 6653(a)(1)(A) and (B) for 1986. [1]
*466 After concessions, the issues to be decided are: 1. Whether certain bank deposits in 1985 and 1986 are income to petitioners. We hold that they are. 2. Whether petitioners are entitled to a home office deduction. We hold that they are not. 3. Whether petitioners may deduct business expenses in excess of those allowed by respondent. We hold that they may in the amounts stated below. 4. Whether petitioner Christos Coutsoubelis is liable for additions to tax for fraud under section 6653(b). We hold that he is not. 5. Whether petitioners are liable for additions to tax for negligence under section 6653(a). We hold that they are. 6. Whether petitioners are liable for additions to tax for substantial understatement of income tax under section 6661. We hold that they are. 7. Whether petitioner Frances Coutsoubelis is entitled to relief as an innocent spouse under section 6013(e). We hold that she is not. 8. Whether inconsistent affidavits and statements by petitioners' tax return preparer are admissible. We hold that they are not. 9. Whether two of petitioners' counsel should have been disqualified from representing petitioners under Rule 24(f) and rule 3.7 of *467 the American Bar Association Model Rules of Professional Conduct. We hold that they should not. References to petitioner in the singular are to Christos Coutsoubelis. Section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
Petitioners are husband and wife who resided in Edison, New Jersey, when they filed their petition. Petitioner was born in Greece in 1934. He worked as a merchant seaman for about 12 years after he graduated from high school. Petitioner entered the United States in 1961 and continued to work as a merchant seaman for 3 or 4 more years. Petitioners met in 1963 or 1964, and married in 1965. In 1965, petitioner became a permanent resident of the United States and began working as a painter. Petitioners lived with Frances Coutsoubelis' (Mrs. Coutsoubelis) parents in New York City the first 2 years they were married. In 1967, they rented an apartment in Perth Amboy, New Jersey, to be closer to petitioner's job with a New Jersey painting *468 contractor. Shortly thereafter, petitioner became a self-employed painter. Petitioner did not have any training in bookkeeping or accounting and never did his own tax returns. Mrs. Coutsoubelis was born in the United States. She took some high school math courses. She quit high school in her junior year to begin work and continued working until she married petitioner. She worked as a file clerk, a waitress, and a factory worker embroidering baby clothes. Mrs. Coutsoubelis' duties as a waitress included preparing bills, including sales tax. Mrs. Coutsoubelis always had someone prepare her tax return when she worked. Petitioners have four daughters and one son, born as follows: Christina in 1965, Theodore in 1967, Nifsica in 1970, Electra in 1972, and Adriadne in 1976. In 1984, all of petitioners' children were in school. Petitioners' personal books and records consisted of a checkbook, bank statements, deposit slips, and canceled checks. Mrs. Coutsoubelis generally paid the household bills. She asked petitioner for the amount of the bank balance before she paid bills. a. Petitioners' Lifestyle
Petitioners' lifestyle was comfortable but not lavish. They owned two *469 cars during the years in issue. Christina and Theodore drove petitioners' cars after they were licensed to drive in 1984 and 1986. During the years in issue, petitioners paid for insurance, repairs, and gas for the cars. Petitioners and their children went to Puerto Plata, Dominican Republic, for 10 or 11 days during the 1985 Christmas holidays. That trip cost about $ 7,000. This was their first vacation since 1981. Two of petitioners' children attended public colleges during the years in issue. Total annual tuition for the two children was about $ 3,600. Petitioners did not receive any financial aid for their children's education in 1985 or 1986. Petitioners had one telephone in their house from 1984 to 1986 for both business and personal use. In 1984 and 1985 petitioners paid for surgical and other medical expenses of petitioner's sister when she came to the United States. The payments were not loans. Petitioners have never owned any stocks, bonds, expensive jewelry, or real estate, except their home. b. Petitioners' House
Petitioners bought their home in 1982 for $ 125,000 with $ 45,000 from the sale of their previous home and an $ 80,000 mortgage. The house *470 has a two-car garage, four bedrooms, three bathrooms, a living room, a dining room, a kitchen, and a family room. Petitioner had a home office during the years in issue. It was like a butler's pantry. It was about 6 by 10 or 12 feet. The office contained a desk and petitioner's maps, specifications, work orders, and other business-related documents. Petitioner estimated and proposed bids for jobs, scheduled jobs, made appointments to visit gas stations for estimates, paid bills, billed customers, and received payments in his home office. He did not meet with clients or store painting supplies in the office. Petitioners wrote checks for their personal and business bills from one account. They kept their checkbook, from which Mrs. Coutsoubelis wrote personal checks, in the office. 2. Metro Maintenance, Inc.
a. Background
Petitioner was a self-employed painting contractor. His principal work was painting gasoline stations according to exacting standards specified by the company which operated the station. He incorporated Metro Maintenance, Inc. (Metro), his painting business, in February 1968. Metro became inactive in the late 1970s. After the corporation became *471 inactive, petitioner did not tell anyone that he did business as a corporation. However, he continued to use the trade name Metro Maintenance, Inc., during the years in issue. The letterhead he used for billing purposes gave the corporate name. Metro's corporate charter was voided by New Jersey on January 14, 1982. Petitioner did not keep formal business records for Metro during the years in issue. His only business records were the checking account records which he used for Metro and petitioners used for their personal finances. Petitioner deposited all gross receipts into the checking account. However, he did not record his deposits. Petitioner's two major customers were Exxon Corp. (Exxon) and Kimber-Allen Petroleum (Kimber-Allen). Kimber-Allen was a local distributor for Citgo, Getty, Mobil, and Amoco petroleum companies. b. Metro's Gross Receipts
Exxon and Kimber-Allen paid petitioner the following amounts during the years in issue: Exxon Kimber-Allen
1984
$ 144,761.75
$ 37,203
1985
131,957.71
58,852
1986
72,345.72
64,899
Petitioner also painted a few stations for independent owners in 1985 and 1986. He was paid as follows: 1985  1986
Well Oil Co.
$  3,551.00
$ 12,211
H.A. Fernot, Inc.
2,520
Longo Construction
3,834.50
675
Auto Kleen, Inc.
3,100
Muscio, Farina & Muscio
1,500
Paul's Garage
6,000.00
Salomone Bros.
2,279
Total
13,385.50
22,285
*472 In addition to the amounts identified above, petitioner also deposited $ 39,898.77 in 1985 and $ 8,708.46 in 1986 into petitioners' checking account. c. Metro's Business Expenses
Petitioners wrote many personal checks and checks to cash from petitioners' account during the years in issue. The total number and amount rounded to nearest dollar of checks written for cash is as follows: Mrs. Coutsoubelis
Total
Petitioner--total
--total
Year
no. of checks
$ amount
no. of checks
$  amount
no. of checks
$ amount
1984
162
$ 46,235
145
$ 42,002
17
$ 4,233
1985
178
35,702
157
31,052
21
4,650
1986
110
27,535
109
22,953
21
4,582
i. Supplies
Petitioner used checks and cash to buy paint and supplies and to pay his workers. Petitioner routinely purchased paint and supplies at Siperstein's Paints (Siperstein's). Petitioner received a contractor's discount from Siperstein's. Petitioner usually paid Siperstein's in cash, but occasionally paid for large purchases by check. Petitioner generally used polyurethane paint which was applied with an activator. During the years in issue, a gallon of paint and the activator cost *473 between $ 25 and $ 45. The paint was mixed in small quantities because it hardens quickly after the activator is added. Petitioner's workers used high quality brushes and rollers to apply the paint. The brushes were very difficult to clean. It was more cost-effective to throw them away than to clean them. ii. Labor
Several of petitioner's workers have worked with him for a long time, including Ramon Moscoso and his brother, Girardo Moscoso. Both Moscosos worked for petitioner at the time of trial. Petitioner's workers generally began work at 7 or 7:30 a.m. and returned home at 5 or 5:30 p.m., sometimes 6 p.m. Petitioner generally paid a full day's wages to his employees for each day they worked. For example, petitioner paid wages for a full day even if they finished at 3 p.m. However, petitioner paid $ 40 to $ 50 if work ended by 11 a.m. Petitioner usually worked along with everyone else. He sometimes had two crews in the summer. Petitioner usually paid the workers by check on Friday or Saturday. He paid for some weekend and overtime work in cash. 3. Petitioners' Tax Return and Tax Return Preparer
Before moving to New Jersey, petitioners had their income *474 tax returns prepared in Astoria, New York. When they moved, petitioner asked friends in the Perth Amboy area to recommend a new accountant because it was a long distance to travel to Astoria. Petitioner met William Weingard (Weingard) through a friend. Weingard did the accounting work for many businesses and individuals. Petitioners hired Weingard to be their accountant and tax return preparer. Weingard prepared petitioners' income tax returns for the years in issue. He usually began the work at petitioners' home with petitioner and then took the return home to finish. Petitioners made all of their records available to Weingard to prepare the returns. Petitioners relied on Weingard to prepare their returns properly. Petitioners did not review their returns after Weingard prepared them. Weingard made numerous errors both in favor of and against petitioners on the income tax returns he prepared for the years in issue. He understated petitioners' gross receipts, Schedule C expenses, mortgage interest (for 1985 and 1986), real estate taxes, and depreciation (for 1985 and 1986). Weingard lied about his educational background and professional qualifications to petitioners, petitioners' *475 counsel, and respondent's agents. He falsely claimed to petitioners and respondent's agents that he graduated from Rutgers University. When he signed petitioners' 1984 and 1985 income tax returns, he falsely represented that he was a certified public accountant in New Jersey. Petitioners learned after the years in issue that Weingard was lying about these matters. Weingard was interviewed by respondent's agents and petitioners' counsel (Mr. Alter and Mr. Sapinski) in December 1988. At that time, Weingard was 88 years old, frail, and in failing health. He voluntarily signed contradictory affidavits for respondent and petitioner. He either read the affidavits or had them read to him before signing them. The affidavit Weingard signed at the request of respondent's agent supported respondent's position that petitioner was responsible for the errors on petitioners' returns; the affidavit Weingard signed for petitioners' counsel supported petitioners' contention that Weingard was responsible for the errors. 4. Audit of Petitioners' Returns
Revenue Agent Joan Bratsch (Bratsch) audited petitioners for 1985 and 1986. Jerome Gunsher (Gunsher) and Steven Stempinski (Stempinski) *476 represented petitioners during the audit. They gave Bratsch worksheets, an unsigned amended 1986 Federal income tax return (Form 1040X), and an amended 1986 New Jersey income tax return, as preliminary discussion drafts showing potential adjustments to the original returns. They had hurriedly assembled the documents without much involvement by petitioner and did not include estimates of cash business expenses. Gunsher and Stempinski concluded that petitioner's gross receipts were $ 242,093.92 for 1985 and $ 168,239 for 1986. They also estimated that petitioners deposited in their checking account loans of $ 6,000 in 1985 and $ 10,000 in 1986. Gunsher and Stempinski believed that petitioners' original returns understated expenses and greatly underreported income. OPINION 1. Petitioners' Gross Income
Respondent used a bank deposits and specific items analysis to determine that petitioners had unreported income for each year in issue. Petitioners have the burden of proving that respondent's determination is incorrect. Rule 142(a). Petitioners argue that they may meet their burden by reasonable denials and that the unreported income was from nontaxable sources. The *477 following chart shows the position of the parties relating to petitioners' gross receipts for the years in issue: Petitioners' gross receipts for
1984 1985 1986 As reported on
Schedule C
$  71,000
$  85,000
$  85,000
Correct amount:
Petitioners'
position
181,964
204,195
159,530
Respondent's
position
181,964
244,095
168,237
Amount in dispute
0
39,900
8,707
Petitioners contend that a taxpayer has a lesser burden to meet in proving nonreceipt of income than in proving a deduction. LaBow v. Commissioner, 763 F.2d 125, 131-132 (2d Cir. 1985), affg. in part and revg. in part T.C. Memo. 1983-417. Petitioners assert that the taxpayer may meet this lesser burden by his own reasonable denials of the validity of the determination. Schaffer v. Commissioner, 779 F.2d 849, 857-858 (2d Cir. 1985), affg. in part and revg. in part Mandina v. Commissioner, T.C. Memo. 1982-34; Demkowicz v. Commissioner, 551 F.2d 929, 931 (3d Cir. 1977), revg. T.C. Memo. 1975-278; Weir v. Commissioner, 283 F.2d 675, 679 (6th Cir. 1960), *478 revg. T.C. Memo. 1958-158. We disagree that petitioners' contention applies here because the issue is not whether they received funds. They admit that they deposited the funds in their bank account and underreported some gross income. Bank deposits are prima facie evidence of the receipt of income. Parks v. Commissioner, 94 T.C. 654, 658 (1990); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The issue is whether the bank deposits are taxable. Petitioners argue that most of the deposits which respondent contends are taxable income are loans from banks, finance companies, or individuals, and insurance refunds. Petitioner testified that he received loans of $ 2,000 from Dino Limperopoulos (Limperopoulos), $ 3,000 from Alex Lourbacos, and $ 15,000 from Byron Votsinas, and deposited part of these loans in the bank. However, petitioners did not offer any documentation of these loans into evidence or call any of these individuals as witnesses to corroborate their claim. Petitioner paid Limperopoulos $ 2,000 in 1984. Petitioner wrote "subcontractor" as a memo on a check that he paid to Limperopoulos, *479 which is also what petitioner wrote on his checks to the Moscoso brothers. At trial, petitioner admitted that he may have been wrong about whether this was a loan. We conclude that petitioner paid $ 2,000 to Limperopoulos for painting work. Petitioners rely on an undated consumer note for $ 7,580 for a 1980 Buick Riviera and an Avco Financial Services statement of interest charges for 1984, 1985, and 1986 to prove that they received loans. However, neither of these documents proves that petitioners borrowed funds and deposited them in their checking account in 1985 or 1986. We conclude that petitioner's business was the source of the deposits except for a few loans for which petitioner provided written corroboration and which respondent concedes are not taxable to petitioners. We hold that the disputed deposits are income to petitioners in 1985 and 1986. 2. Home Office Deduction
Petitioners argue that they qualify for a home office deduction because petitioner used a room in his house for his painting business. A deduction is allowed for an office in the home to the extent a portion of the home is exclusively used on a regular basis as the principal place of business *480 for any trade or business of the taxpayer, or as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business. Sec. 280A(c)(1). The determination of the principal place of business depends on the particular facts of each case. Commissioner v. Soliman, 506 U.S.    , 113 S. Ct. 701, 706 (1993). Two primary considerations in deciding whether a taxpayer may deduct costs of a home office are: (1) The relative importance of the activities performed at each business location; and (2) the time spent at each place. Id.
If the nature of the trade or profession is to deliver a service to a customer, as in the instant case, the place where that contact occurs is often an important indicator of the principal place of business and must be given great weight in determining where the most important functions are performed. Id. The necessity of the functions performed at home is not entitled to controlling weight in determining entitlement to the deduction. Id. at    , 113 S. Ct. at 707. The Supreme Court also stated: *481 There may be cases when there is no principal place of business, and the courts and the Commissioner should not strain to conclude that a home office qualifies for the deduction simply because no other location seems to be the principal place. The taxpayer's house does not become a principal place of business by default.
Id. at    , 113 S. Ct. at 707-708. a. Relative Importance of the Activities Performed at Each Location
Painting was the essence of petitioner's business, even though he performed other important functions in his home office such as preparing bids, scheduling work, and contacting workers and customers by telephone. Since painting was done at gas stations, this important factor clearly points to denial of petitioners' home office deduction. b. Time Spent at Each Place of Business
Petitioners did not establish how much time petitioner spent in his office. It appears from the record that petitioner spent most of his time working at gas stations. This fact also points to denial of petitioners' home office deduction. c. Comparison to Outside Salespersons
Petitioners argue that their home office was petitioner's *482 principal place of business under principles like those applicable to outside salespersons. Section 1.280A-2(b)(3), Proposed Income Tax Regs., 45 Fed. Reg. 52403 (Aug. 7, 1980), amended 48 Fed. Reg. 33324 (July 21, 1983), provides: (3) Determination of principal place of business. When a taxpayer engages in a single trade or business at more than one location, it is necessary to determine the taxpayer's principal place of business for that trade or business in light of all the facts and circumstances. Among the facts and circumstances to be taken into account in making this determination are the following: (i) The portion of the total income from the business which is attributable to activities at each location; (ii) The amount of time spent in activities related to that business at each location; and (iii) The facilities available to the taxpayer at each location for purposes of that business. For example, if an outside salesperson has no office space except at home and spends a substantial amount of time on paperwork at home, the office in the home may qualify as the salesperson's principal place of business.
*483 The Internal Revenue Service announced that it would modify section 1.280A-2(b)(3), Proposed Income Tax Regs., supra, in response to Commissioner v. Soliman, supra, but will not challenge taxpayers who rely on this proposed regulation for taxable years before 1991. Notice 93-12, I.R.B. 1993-8, 46-47. We concluded above that petitioner did not spend enough time in his home office to establish it as Metro's principal place of business under Commissioner v. Soliman, supra. Similarly, we conclude that petitioners do not meet the example in the proposed regulation because petitioners have not shown that petitioner spends a substantial amount of time on paperwork in the home office. Thus, we hold that petitioners are not entitled to a home office deduction under the proposed regulation. 3. Business Expense Deductions
The following chart shows the position of the parties relating to petitioners' Schedule C deductions: Petitioners' Schedule C deductions 1984 1985 1986 As reported on
Schedule C
$  44,770
$  66,970
$  52,870
Correct amount:
Petitioners'
position
155,638
172,007
137,994
Respondent's
position
104,094
118,110
81,063
Amounts in dispute
51,544
53,897
56,931
*484 a. Cohan Rule
A taxpayer may deduct all ordinary and necessary business expenses paid or incurred during the taxable year. Sec. 162(a). Respondent concedes that petitioners may deduct business expenses which are corroborated by checks, but not expenses for which petitioner contends he paid cash. [2]
Petitioners argue that they are entitled to deduct business expenses paid in cash of at least $ 30,000 per year for labor and materials. A taxpayer bears the burden of proving that he is entitled to any deductions or credits claimed on his return. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Petitioners ask the Court to apply the Cohan rule. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930), affg. in part and modifying in part 11 B.T.A. 743 (1928). "If a claimed deduction is not adequately *485 substantiated, we are permitted to estimate expenses when we are convinced from the record that the taxpayer has incurred such expenses. * * * However, we must have some basis upon which an estimate may be made." Polyak v. Commissioner, 94 T.C. 337, 345-346 (1990). The application of the Cohan rule depends upon the facts and circumstances of each case. Stemkowski v. Commissioner, 82 T.C. 854, 867 (1984). Petitioner, Selby, Burrell, and the Moscoso brothers testified that petitioner regularly paid some business expenses in cash, including paint supplies and weekend wages, in each of the years in issue. Selby estimated that petitioner made cash purchases at Siperstein's of about $ 4,000 to $ 6,000 in 1984 and about $ 8,000 to $ 10,000 in 1985. The testimony of these witnesses convinces us that petitioner paid business expenses in cash and that we have a sufficient factual basis upon which to make an estimate. However, the burden of inexactitude falls on the taxpayer who did not keep adequate records. Cohan v. Commissioner, supra.We have considered the testimony of these witnesses, *486 and respondent's argument that petitioners did not write enough checks to cash to cover the full amount of their claimed cash business expenses. Bearing heavily against petitioners, our best estimate is that petitioners are entitled to business expense deductions of $ 8,000 for 1984, $ 12,000 for 1985, and $ 12,000 for 1986 in addition to the amounts allowed by respondent. b. Ramanauskas' Report
Petitioners argue that they proved through the expert analysis of Mr. Vidas Ramanauskas (Ramanauskas) that petitioner's average gross profit margin from 1984 to 1986 was about 30 percent. Petitioners contend that this proves that petitioner spent at least $ 30,000 per year in cash on labor and material expenses during the years in issue. We are not convinced by Ramanauskas' conclusion for the reasons stated below. Ramanauskas selected four gas stations from several hundred that petitioner painted during the years in issue. He then estimated the cost to paint a station by making adjustments to data that he obtained from the R.S. Means Co. Building Construction Cost Data (RSM). His estimates are as follows: Station
Amount
Estimated
location
bid
cost
Mendham
$   950
$   484
Union
1,875
969
Liberty Corner
1,100
710
Belford
1,650
1,749
Total
5,575
3,912
*487 Ramanauskas then applied the following formula to arrive at his conclusion of gross profit percentage: Contract price - (labor & materials costs) / Contract price = $ 5,575 - 3,912 / 5,575 = 29.8% We are not convinced that the four stations Ramanauskas selected are a valid sample of the several hundred stations that petitioner painted during the years in issue. He did not justify the sample he used. He did not categorize the samples by type of work to be done. Petitioner testified that he did not always paint the entire gas station. He said sometimes he painted the entire outside, the entire inside, or a single wall, the doors, the trim, or only poles. Ramanauskas did not indicate how he took this factor into account. We believe Ramanauskas overestimated the cost to paint those stations because he used costs from much larger firms and larger projects which he obtained from RSM. The average contractor who submitted data for RSM had average gross revenues of $ 3,245,000 and $ 9,143,000. RSM primarily considers projects costing $ 500,000 or more. We also believe Ramanauskas overestimated petitioner's costs. Ramanauskas estimated that the hourly labor rates for the four sample *488 stations were $ 22.78 to $ 32.61 per hour. Petitioner's invoices to Exxon indicate a rate of $ 18 per hour. Petitioner's workers received $ 80 to $ 90 for a full day's work, which was about $ 10 to $ 15 an hour. Even allowing for some short work days at full pay, Ramanauskas' estimates are too high. Ramanauskas also included petitioner's labor as a cost to petitioner even though petitioner did not pay himself wages. Ramanauskas erroneously used retail prices for paint and materials because he was not aware that petitioner received a contractor's discount at his local stores. Thus, we conclude that Ramanauskas overestimated petitioner's costs. For the foregoing reasons, Ramanauskas' report and testimony do not alter our conclusion as to the amounts of petitioner's cash business expenses. 4. Additions to Tax for Fraud Under Section 6653(b)
Respondent determined that petitioner is liable for additions to tax for fraud under section 6653(b). For purposes of section 6653(b), fraud means "actual, intentional wrongdoing," Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); or the *489 intentional commission of an act or acts for the specific purpose of evading a tax believed to be owing, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Castillo v. Commissioner, 84 T.C. 405, 408 (1985); Stone v. Commissioner, 56 T.C. 213, 220 (1971). A conscious purpose to defraud goes beyond negligence, carelessness, misunderstanding or unintentional understatement of income. United states v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956). Fraud may be inferred from conduct the effect of which would be to mislead or conceal, Spies v. United States, 317 U.S. 492, 499 (1943), or otherwise prevent the collection of taxes, Webb v. Commissioner, supra at 377. Courts have developed a number of *490 objective indicators, or "badges" of fraud. Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). For example, respondent may show various indicia or "badges of fraud" including: (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) engaging in illegal activities; (8) attempting to conceal illegal activities; (9) dealing in cash; and (10) failing to make estimated tax payments. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Respondent contends that the following badges of fraud are present because, according to respondent, petitioner: (1) Underreported substantial amounts of income; (2) knew that the amount of income petitioner earned *491 exceeded the amount he reported; (3) failed to keep books and records; (4) misled his customers into believing he was a corporation, thus preventing the issuance of Forms 1099; (5) did not pay sales and income taxes to New Jersey; and (6) gave implausible explanations for understating his expenses. Respondent correctly points out that petitioners underreported their income. However, the preparer also significantly underreported petitioners' expenses. This casts doubt on whether underreporting income is a badge of fraud here. Also, petitioner relied on Weingard to properly report his income. Respondent argues that petitioner knew his income exceeded the amount he reported. We disagree. We believe that petitioner did not know of the excess. Petitioner did not keep formal records, but he deposited all of his receipts in petitioners' checking account showing he was not bypassing that bank account to conceal income. Respondent argues that petitioner gave inconsistent statements to respondent's agents and to the Court. However, respondent's examples of alleged inconsistencies are taken out of context. Generally, petitioner gave consistent statements which we accept as credible. *492 Respondent asserts that petitioner did not inform his customers that Metro was no longer a corporation when his corporate charter was voided in 1982 so they would not issue Forms 1099 to him. We disagree. We believe that petitioner simply wanted to maintain goodwill by using the same business name, and was not considering whether he would receive Forms 1099. Respondent asserts that petitioner did not pay New Jersey sales and income taxes, and that this is a badge of fraud. Respondent has not proven that petitioner intended not to pay New Jersey sales and income taxes. As we observed more than 40 years ago: Although the bookkeeping was inadequate by any standard, there is no evidence of intentional concealment or deliberate misrepresentation. The errors were patent to any one versed in accountancy. The petitioners were guilty of poor judgment in not having the books audited but poor judgment and ignorance are not tantamount to fraud. There is lacking one essential element, the very heart of the fraud issue, namely, the intent to defraud the Government by calculated tax evasion.
Iley v. Commissioner, 19 T.C. 631, 635 (1952). We are *493 not convinced that petitioner acted with the specific purpose of evading taxes that he believed he owed. Instead, it appears that petitioner relied upon an unqualified return preparer. Such reliance may be a defense to fraud. Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976); Marinzulich v. Commissioner, 31 T.C. 487, 491-492 (1958); Iley v. Commissioner, supra.We hold that petitioner is not liable for additions to tax for fraud under section 6653(b) for the years in issue. 5. Additions to Tax for Negligence Under Section 6653(a)
Respondent determined that petitioners are liable for additions to tax for negligence under section 6653(a)(1) and (2) for 1984 and 1985, and section 6653(a)(1)(A) and (B) for 1986. For petitioner, this was an alternative to the fraud determination. Section 6653(a)(1), and later section 6653(a)(1)(A), impose an addition to tax of 5 percent of the underpayment of income tax if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2), and later section 6653(a)(1)(B), impose an *494 additional liability of 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules and regulations. Negligence is lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners argue "that respondent's fraud determination is so completely at odds with a negligence assertion that it constitutes a new matter * * * upon which respondent should bear the burden of proof." We disagree. Respondent alleged negligence in the deficiency notice. Thus, petitioners bear the burden of proving that their underpayments were not the result of negligence. Rule 142(a); Warrensburg Board & Paper Corp. v. Commissioner, 77 T.C. 1107, 1112 (1981); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners argue that they are not liable for the additions to tax for negligence because: (1) They are unsophisticated and have limited education and no accounting experience; (2) they relied in good faith on Weingard; (3) they fully disclosed all of *495 their records to Weingard; (4) they had no reason to know that Weingard did not prepare accurate returns; and (5) they did not experience any sudden increase in their living standard to alert them to inaccuracies on their returns. We recognize that good faith reliance on the advice of counsel or a qualified accountant can be, under certain circumstances, a defense to the addition to tax for negligence. Ewing v. Commissioner, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). However, good faith reliance does not mean that a taxpayer need not review his return. See, e.g., Dennis v. Commissioner, T.C. Memo. 1984-4. In Metra Chem. Corp. v. Commissioner, 88 T.C. 654, 662 (1987), the taxpayer failed to report cash dividends totaling more than 20 percent of its gross income. In that case we said: *496 We believe that such a substantial underreporting of income would not have gone unnoticed if the petitioners had made even a cursory review of their returns. Under such circumstances, the petitioners may not shift responsibility for the accuracy of their returns to their accountant. * * *
Id. at 662. We believe petitioners were negligent because they did not maintain adequate records and they did not review their returns. Petitioner was a capable entrepreneur. With the exercise of due care, he and his wife could have realized there was substantial underreporting of income. They did not keep adequate records or review their returns. Had they done these things, it would have been readily apparent that their returns were incorrect. We hold they are liable for additions to tax for negligence under section 6653(a). 6. Addition to Tax for Substantial Understatement of Tax Under Section 6661
Respondent determined that petitioners are liable for the addition to tax under section 6661(a) for substantial understatement of tax liability for the years in issue. Section 6661 imposes an addition to tax when there is a substantial understatement *497 of income tax for a taxable year. The addition to tax is equal to 25 percent of the amount of any underpayment attributable to the substantial understatement. Sec. 6661(a). A substantial understatement exists if in any year the amount of the understatement exceeds the greater of 10 percent of the amount required to be shown on the return or $ 5,000. Sec. 6661(b)(1). Petitioners contend that they are not liable for this addition to tax because there was no understatement of income tax. As discussed above, we have found understatements in all 3 years in issue. Accordingly, we sustain respondent's determination that petitioners are liable for the addition to tax under section 6661. 7. Innocent Spouse Relief Under Section 6013(e)
Mrs. Coutsoubelis argues that she is entitled to relief as an innocent spouse under section 6013(e). To be entitled to relief as an innocent spouse, she must prove that: (1) She filed a joint return for the years in issue; (2) there was a substantial understatement of tax attributable to grossly erroneous items of petitioner on the return; (3) she did not know and had no reason to know of the substantial understatement when signing the return; *498 and (4) taking into account all the facts and circumstances, it is inequitable to hold her liable for the deficiency. Sec. 6013(e). Mrs. Coutsoubelis bears the burden of proving each of these elements. Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986), affg. on this issue T.C. Memo. 1984-310; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d. 1132 (11th Cir. 1993). a. Joint Return
Petitioners filed joint returns for each of the years in issue. b. Substantial Understatement Due to Grossly Erroneous Items
Respondent concedes that the understatements were substantial and due to grossly erroneous items attributable to the other spouse. c. Know or Have Reason To Know of the Understatement
Mrs. Coutsoubelis testified that she had no actual knowledge of the understatements. Even if she had no actual knowledge, we believe she had reason to know of the understatements. The "reason to know" standard is whether a reasonably prudent person with Mrs. Coutsoubelis' background and knowledge, having the facts known or reasonably available, *499 would have known that the return contained a substantial understatement. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Purcell v. Commissioner, 86 T.C. 228, 237-238 (1986), affd. 826 F.2d 470 (6th Cir. 1987); Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979). Mrs. Coutsoubelis was only peripherally involved in her husband's business, but petitioners shared their income and bank account in which petitioner deposited all the gross receipts from his business. Mrs. Coutsoubelis paid household bills from that account and knew the amount of the bank balance before she paid them. During the years in issue, approximately $ 350,000, representing well over half the gross receipts from the business, was omitted from petitioners' tax returns. Mrs. Coutsoubelis should have realized that their reported income was insufficient for their lifestyle. The fact that she did not prepare, review, or make inquiries about the income tax returns does not entitle her to claim that she should not have known of the *500 understatement. Petitioners have not convinced us that she had no reason to know of the understatement. Therefore, we hold that Mrs. Coutsoubelis is not entitled to relief as an innocent spouse under section 6013(e). We need not reach the issue of whether it is inequitable to hold Mrs. Coutsoubelis liable for the deficiencies under section 6013(e)(1)(D). 8. Weingard's Affidavits and Statements Are Inadmissible
Weingard signed an affidavit for respondent which blamed petitioners for the errors on their returns. Weingard signed a contradictory affidavit for petitioners which states that petitioner provided Weingard with all of the business records that Weingard wanted and that Weingard completed the returns. Weingard also made contradictory statements to respondent's agents and petitioners' counsel. Each party obtained an affidavit from Weingard in which he said what the party wanted him to say. Each party offered into evidence the affidavit which supported that party's position and objected on hearsay grounds to admitting the affidavit offered by the other party. The affidavits are directly contradictory. Weingard died before trial. He was 88 years old, frail, and *501 in poor health when he signed the affidavits. His inconsistency may have resulted from not knowing what he was signing, an excessive desire to please, or sharply diminished faculties due to his poor health. Whatever the cause, we think the affidavits and statements to the interviewers, in these circumstances, are totally untrustworthy. The Court ruled at trial that Weingard's affidavits were inadmissible. Petitioner does not challenge the Court's ruling unless Weingard's affidavit obtained by respondent's agents is admitted. Respondent argues for admission of Weingard's affidavits and statements made to respondent's agents under rule 804(b)(5) of the Federal Rules of Evidence.Rule 804(b)(5) of the Federal Rules of Evidence, known as the residual exception, provides an exception to the hearsay rule if, among other requirements, the statement has circumstantial guarantees of trustworthiness equivalent to those provided in the enumerated hearsay exceptions of rules 803 and 804 of the Federal Rules of Evidence.
The residual hearsay exceptions in rules 803(24) and 804(b)(5) of the Federal Rules of Evidence are to be used very rarely and only in exceptional circumstances. Petzoldt v. Commissioner, 92 T.C. 661, 679 (1989). *502 The flatly inconsistent nature of Weingard's statements shows that they lack circumstantial guarantees of trustworthiness. Thus, as at trial, we conclude that neither affidavit is admissible under rule 804(b)(5) of the Federal Rules of Evidence.
About 3 weeks before trial, respondent called petitioners' counsel, Mr. Alter and Mr. Sapinski, to testify at trial about their interview of Weingard and the affidavit, and filed a motion to disqualify Mr. Alter and Mr. Sapinski from representing petitioners under Rule 24(f) and rule 3.7 of the American Bar Association Model Rules of Professional Conduct (ABA rule 3.7). Rule 24(f) provides in pertinent part: If any counsel of record * * * is a potential witness in a case, then such counsel must either * * * withdraw from the case; or take whatever other steps are necessary to obviate a conflict of interest or other violation of the ABA Model Rules of Professional Conduct, and particularly Rules 1.7, 1.8, and 3.7, thereof. * * *
ABA rule 3.7(a) provides in relevant part: (a) a lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where (1) the testimony relates to an uncontested *503 issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client. At trial the Court ruled that respondent could call one of petitioners' counsel, and that the counsel respondent called could continue to represent petitioners at trial. Respondent called Mr. Alter to testify. We affirm our ruling here because: (1) Disqualification of Mr. Alter on the eve of this complex and lengthy trial would have caused substantial hardship to petitioners, ABA rule 3.7(a)(3); (2) respondent did not show that Mr. Alter was a necessary witness, ABA rule 3.7(a); and (3) the issue to which Mr. Alter would testify, i.e., the circumstances surrounding his interview with Weingard, was not a contested issue, ABA rule 3.7(a)(1). The drafters of the Model Code have cautioned that the ethical rules were not designed to permit a lawyer to call opposing counsel as a witness and thereby disqualify him as counsel. Optyl Eyewear Fashion Intl. Corp. v. Style Cos., 760 F.2d 1045, 1050 (9th Cir. 1985). Because of their potential for abuse, disqualification motions *504 should be subject to particularly strict judicial scrutiny. Id.; see also Council for Natl. Register of Health Serv. Providers in Psychology v. American Home Assur. Co., 632 F. Supp. 144, 147 (D.D.C. 1985); Kalmanovitz v. G. Heileman Brewing Co., 610 F. Supp. 1319, 1323 (D. Del. 1985). We note that Rule 24(f) does not require Mr. Alter's withdrawal. We conclude that the Weingard affidavits and statements lack sufficient guarantees of trustworthiness to be admissible under rule 804(b)(5) of the Federal Rules of Evidence.
To reflect concessions and the foregoing, Decision will be entered under Rule 155. Footnotes
1. Respondent determined an addition to tax for fraud under sec. 6653(b)↩ only for petitioner Christos Coutsoubelis.
2. Fifty percent of the interest due on the entire deficiency.↩
1. For Christos Coutsoubelis this was an alternative to respondent's determination that he is liable for the addition to tax for fraud.↩
2. Respondent concedes that petitioners may deduct the following amounts which petitioners paid by check: ↩
Item
1984 1985 1986 Labor
$ 53,277
$ 68,020
$ 39,185
Paint supplies & materials
25,357
25,698
20,993
Legal & professional
100
150
100